IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH
CAROLINA CHARLOTTE DIVISION

**Thelma Mackins**,
as the Administrator for the
Estate of Jason B. Lipscomb,
      Plaintiff,

Officer **JUAN PABLO
SEPULVEDA CADAVID** in his
individual capacity, Officer **JASON
LEE BEAVER** in his individual
capacity, and Officer **HARRISON
HAMORSKY** in his individual
capacity,  Officers **JOHN AND
JANE DOE** 1-2 in their individual
capacities, and the **CITY OF
GASTONIA**,

     Defendants.

_____ /

<u>COMPLAINT</u>


<u>(JURY TRIAL DEMANDED)</u>

     COMES NOW Plaintiff Thelma Mackins, as the Administrator for the Estate of Jason B. Lipscomb (hereinafter "Plaintiff"), by and through the undersigned attorney, and hereby files this Complaint against the City of Gastonia, Officer Juan Sepulveda, in his individual capacity; Officer Jason Beaver, in his individual capacity; Officer Harrison Hamorsky, in his individual capacity:

## INTRODUCTION

*The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.*

*------ Justice Byron White, Tennessee vs Garner, 471 U.S. 1 (1985)*

1. On July 20, 2022, Jason B. Lipscomb—a 21-year-old unarmed Black man—was gunned down by Gastonia police officers as he tried to drive away. Gastonia Police Department ("GPD") officers-Beaver, Sepulveda, and Hamorsky-unleashed a barrage at Mr. Lipscomb's fleeing vehicle. One officer emptied an entire magazine, reloaded, and kept shooting. Another fired nine rounds from the rear quarter panel as the car accelerated away. A third squeezed off shots from fifteen yards, long after the vehicle had cleared every officer's path. Two officers on scene-GPD Officer Jason Eaker and Gaston County Sheriff Deputy Matthew Williams-did not discharge their firearms, confirming that a reasonable officer could have perceived no immediate threat.

2. The scene was stark in its simplicity: *No warrant. No missing children. No weapon. No threat.* As the Court made clear in *Barnes v. Felix*, 601 U.S. ___ (2025), we evaluate Sepulveda, Beaver, and Hamorsky's use of force in light of the whole encounter—what led up to it, what occurred during it, and what followed—rather than isolating the split second when the firearm discharged.. The totality of

circumstances here reveals not a lawful use of force, but an unconstitutional execution. Although the shooting officers would later assert the car struck a fellow officer, contemporaneous video and trajectory evidence refute an ongoing threat.

3. This case is not only about what these officers did—but about why they believed they could do it without consequence. For over a decade, the City of Gastonia has cleared every officer-involved shooting of a Black civilian as "justified," regardless of the facts. It has never disciplined an officer for deadly force. Black civilians' complaints of excessive force are systematically dismissed, while similar complaints by white civilians are occasionally sustained. These disparities are no accident. They reflect entrenched municipal policies that reward racialized violence and foreclose accountability. Mr. Lipscomb was not just killed by three officers—he was killed by a City that trained them, empowered them, and promised they'd never be held responsible.

4. The Supreme Court and the Fourth Circuit have long drawn a bright line: once a moving car is past the officer-or never aimed at the officer at all-or the officer is no longer in the trajectory of the vehicle, the threat has ended, and the trigger must be stilled. *Waterman v. Batton* and *Williams v. Strickland* makes that rule unmistakable. Deadly force used after the danger has passed is not law enforcement; it is an execution.

5. This lawsuit calls that principle into action. It seeks accountability for an encounter in which the totality of the circumstances-the officers' own admissions, the bullet trajectories, the absence of any weapon, and the safe return of the children allegedly "abducted"-reveals not a split-second mistake but a deliberate,

unconstitutional choice. The Fourth Amendment demands better. So does Jason Lipscomb's memory.

## JURISDICTION AND VENUE

6. This case of action arises out of Gaston County North Carolina.

7. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims under the U.S. Constitution, which are brought both directly under 42 U.S.C. § 1983.

8. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367 because it is so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

9. This Court has personal jurisdiction over all Defendants as it relates to Plaintiff's state law claims.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2). All of the events giving rise to this Complaint occurred within this District.

## PARTIES

11. At all times relevant hereto, Plaintiff Thelma Mackins as the Administrator for the Estate of Jason B. Lipscomb, is the mother of the decedent Jason B. Lipscomb, and a citizen of the United States of America.

12. At all times relevant hereto, Defendant Jason Lee Beaver was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state law in his capacity as a law enforcement officer employed by the GPD. Defendant Jason Lee Beaver is sued in his individual capacity. Upon information

and belief, Defendant is a resident of Gaston County.

13. At all times relevant hereto, Defendant Juan Sepulveda was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state law in his capacity as a law enforcement officer employed by the GPD. Defendant Juan Sepulveda is sued in his individual capacity. Upon information and belief, Defendant is a resident of Gaston County.

14. At all times relevant hereto, Defendant Harrison Hamorsky was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state law in his capacity as a law enforcement officer employed by the GPD. Defendant Harrison Hamorsky is sued in his individual capacity. Upon information and belief, Defendant is a resident of Gaston County.

15. The City of Gastonia (the "City") is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. It maintains and operates the Gastonia Police Department ("GPD"). Employees of GPD are employees and agents of the City, which bears legal responsibility under state law for negligent acts and omissions of GPD in the course of their employment. The City is responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

16. The City of Gastonia ("City") was and is a municipal corporation located in Gaston County, North Carolina duly chartered and existing pursuant to the provisions of N.C. Gen. Stat.§ 160A-1 l and vested with corporate powers and rights as specified in N.C. Gen. Stat.§ 160A-l l, including, but not limited to, the capacity

to sue and be sued. At all times relevant to this action, Defendant City acted through its managers and policy makers, including the employees of the Gastonia Police Department ("GPD"); and the acts, edicts, and practices of said persons represent the official policies of Defendant City.

17. Further, on information and belief, the City of Gastonia, at the time of the shooting. had waived governmental or sovereign immunity from the state law tort claims in this case pursuant to G.S. § 160A-485, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify the City and its agents for any judgment against it or its agents named in this action.

18. Upon information and belief, to the extent that any and/or all of the Defendants in this action claim they are a municipal and/or governmental and/or City owned, operated, and/or funded entity or an employee and/or agent of any such entity such Defendants do not have governmental immunity and/or sovereign immunity for any of the acts or omissions described herein.

19. In the alternative, should any and/or all of the Defendants in this action have governmental immunity and/or sovereign immunity, upon information and belief, any and/or all such Defendants have waived any and all such governmental immunity/or sovereign immunity to which they may have been otherwise entitled for themselves, their agents, employees and all officials acting in their official (and, if applicable, individual) capacities for civil liability and tort by the act of purchasing (or otherwise procuring, obtaining and/or having in place) liability insurance (or the functional and substantive equivalent thereof, i.e., participation in a local

governmental risk pool, etc.) prior to, concurrent with, and/or subsequent to and/or applicable to the acts and omissions alleged herein.

20. Upon information and belief, at all times relevant to this action, Trent Conrad ("Conrad"), was an adult citizen and resident of Gastonia, Gaston County, North Carolina. He is sued in his official capacity as Chief of the Gastonia Police Department ("GPD") under both state and federal law.

21. At all times relevant to the allegations alleged in this Complaint, Defendants were employed by the Defendant City and/or City of Gastonia as a law enforcement officer and Chief of Police, and was acting at all relevant times as an agent of City within the course and scope of their duties as a sworn officers of the Gastonia Police Department and under the color of laws, statutes, regulations, customs, practices and usage of the City of Gastonia, County of Gaston and the State of North Carolina. Defendants are sued in their official capacity for compensatory damages under both State and Federal law.

22. The grossly negligent acts, omissions and liability of all Defendants includes their agents, principals, employees and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, corporate liability, actual authority, apparent authority, actual agency, ostensible agency and/or *respondeat superior* and the acts and/or omissions of the above- named Defendants were a direct and proximate cause of the injuries, damages and losses sustained by the Plaintiff.

23. In 1986, the Interlocal Risk Financing Fund of North Carolina (IRFFNC) self-insured pool was formed under NCGS Chapter 160A, Article 20. IRFFNC is also known as the Property and Casualty Trust and is administered by the North Carolina League of Municipalities and overseen by the Risk Management Services Board of Trustees.

24. Upon information and belief, Defendant City of Gastonia has police professional liability coverage, public official liability coverage, and excess coverage through the Interlocal Risk Financing Fund of North Carolina.

25. Upon information and belief, liability insurance policy issued by the Interlocal Risk Financing Fund of North Carolina may provide coverage for some or all of Plaintiff's claims herein.

26. Upon information and belief, the City maintained some amount of liability insurance.

27. Upon information and belief, the City's Policy shows $5 m per occurrence *and* aggregate (same figure) and excludes punitives.

28. Upon information and belief, the City of Gastonia has purchased liability insurance or participates in a self-funded risk pool through the Interlocal Risk Financing Fund of North Carolina (IRFFNC), which provides coverage for claims of bodily injury and constitutional torts committed by its employees, including police officers. By procuring such coverage, the City has waived governmental and public official immunity to the extent of that coverage, pursuant to N.C. Gen. Stat. § 160A-

485. As a result, neither the City nor its officers are entitled to claim immunity as a defense to Plaintiff's state law causes of action, including assault and battery.

29. The City of Gastonia has waived governmental and public official immunity, in whole or in part, by procuring liability insurance and/or participating in a local government risk pool—including but not limited to the Interlocal Risk Financing Fund of North Carolina (IRFFNC)—as permitted under N.C. Gen. Stat. § 160A-485. This insurance or risk pool participation provides coverage for claims of personal injury, bodily injury, or constitutional violations committed by its employees, including law enforcement officers. Accordingly, pursuant to Fabrikant v. Currituck Cnty., 174 N.C. App. 30, 38 (2005), and Paquette v. Cnty. of Durham, 155 N.C. App. 415, 418 (2002), Plaintiff expressly alleges that the City of Gastonia has waived any defense of governmental immunity to the extent of such coverage.

30.

31. Upon information and belief, the City Manager, acting under authority delegated by the City Council, exercised final policymaking authority by reviewing the fatal shooting of Jason Lipscomb and determining that the officers' actions conformed to the City of Gastonia's use-of-force policies and applicable law. This decision, made without imposing discipline or initiating policy changes, constitutes ratification of the officers' conduct, rendering the City liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

32. Upon information and belief, the City of Gastonia has vested final policymaking authority over officer discipline and use-of-force complaint review in

its City Manager, pursuant to the City's municipal code and organizational structure.

33. The City Manager is designated as the chief administrator of the city, responsible to the council for administering all municipal affairs placed in their charge by the council, as well as those assigned by the charter or ordinance.

34. This position entails oversight of all city departments, including the Police Department, and the implementation of policies set by the City Council.

35. The Chief of Police is appointed by the city and is authorized to manage the Police Department's operations.

## FACTUAL ALLEGATIONS

*Events That Occurred on July 20, 2022*

### Dispatch Radio About a Suspected Kidnapping

36. On July 20, 2022, Trinity Adams, and her mother, Tina Adams, reported to law enforcement an alleged kidnapping of Tina's two sons, who were also Trinity's brothers.

37. Trinity and Lipscomb shared a daughter, Jamira Lipscomb, age one. All children attended the same daycare.

38. Daycare employees were familiar with Lipscomb, who they stated was on the list to pick up his daughter since the first day Lipscomb's daughter started there, and that Lipscomb picked up the Jamira Lipscomb and Trinity's two little brothers all of the time.

39. The daycare employees routinely observed Lipscomb driving the silver Hyundai, which was involved in this incident, without the mother,

Trinity.

40. Neither the daycare nor the daycare employees reported any children belonging to Mr. Lipscomb or Trinity as missing or having been kidnapped or abducted from the daycare.

41. Neither the daycare nor the daycare employees reported Trinity's brothers as missing or having been kidnapped or abducted from the daycare.

42. After Trinity and her mother reported the alleged kidnapping, uniformed police officers with the City of Gastonia Police Department, including Officers Harrison Hamorsky, Jason Beaver, Officer Ethan Brown along with plainclothes officer Juan Sepulveda, knocked on the front door of where Mr. Lipscomb's mother resided, about a possible abduction. The police officers stated they were looking for Lipscomb and the three children.

43. On July 20, 2022, officers did not have an arrest warrant for Jason Lipscomb.

44. Dispatch identified Lipscomb as a suspect in a domestic custody dispute, but officers had no reliable information indicating he had committed a violent crime or posed a threat to public safety.

45. No Defendant officer had observed Lipscomb commit any offense prior to using force.

46. Before the encounter escalated, the allegedly abducted children had safely exited the residence and were with their mother. Thus, there was no ongoing child abduction or exigency to justify deadly force.

47. Defendant Officers on scene knew the children were not in the vehicle,

eliminating any hostage rescue or imminent danger justification.

48. Prior to the encounter, GPD Officer Jason Eaker described Mr. Lipscomb as "cordial" and he obeyed the commands of a Gaston County Sheriff Deputy.

**Shooting Incident**

49. Lipscomb's father, Mr. Robert Hamlett, went to answer the door, and a GPD Detective asked for Lipscomb. The detective told Mr. Hamlett that they did not have a warrant for Lipscomb and did not enter the residence.

50. Prior to law enforcement's arrival at the home of Mr. Lipscomb's mother, Trinity had already left with her daughter, whom she and Mr. Lipscomb shared. A resident informed Defendant Hamorsky of the same as he and Defendants Hamorsky and Sepulveda waited outside the residence to speak to the occupants of the home.

51. Detective Sepulveda was already at the scene and later recalled seeing Trinity and her mother with the two boys who matched the description of the children allegedly taken from the daycare. The description was a one-year-old and three-year-old child. The officers returned the children to Tina.

52. No violent crime was in progress. The alleged kidnapping had been resolved before the shooting, and there was no warrant or intel suggesting Lipscomb was armed or violent.

53. At all times relevant, Defendants Hamorsky, Beaver, and Sepulveda were engaged in law enforcement activity on behalf of the City of

Gastonia.

54. When Defendants Hamorsky, Beaver, and Sepulveda (collectively, "Defendant Officers") arrived at the residence, all children had already been secured before officers used deadly force on Mr. Lipscomb.

55. Defendant Officers saw the vehicle tied to the kidnapping parked and unoccupied.

56. Although Defendant officers later asserted that Mr. Lipscomb was driving a 'stolen vehicle,' the vehicle belonged to Mr. Lipscomb and had previously been in his possession—facts known or readily ascertainable by law enforcement. No warrant had been issued, and the vehicle was not being actively tracked as stolen at the time of the encounter.

57. While officers were speaking to Robert Hamlett, Officer Hamorsky reported that he saw the children exit a home and walk to a woman, later identified as Tina Adams.

58. Officer Hamorsky knew Tina Adams was the mother of the two boys and that the two boys were safely secured with their mother. Defendant Hamorsky's body worn camera ("BWC") footage from the date of the incident confirms this at timestamp 12:51:42. Despite this, Tina Adams would scream "bitch you fucking with the wrong one," before officers gave to run.

59. Neither Tina's two boys nor the daughter, Mr. Lipscomb and Trinity shared, were with Mr. Lipscomb at the time he encountered officers.

60. Prior to their use of deadly force against Mr. Lipscomb, Defendants Beaver, Hamorsky, and Sepulveda only knew Mr. Lipscomb was the suspect in a

child abduction call, based on dispatch and radio traffic.

61.    As officers were speaking to Robert Hamlett, Mr. Lipscomb was seen walking from the rear of residence.

62.    Tina Adams alerted law enforcement to Mr. Lipscomb, and Mr. Lipscomb gave chase on foot.

63.    Officer Ethan Brown led the foot chase and Mr. Lipscomb ran towards a silver Hyundai parked nearby in a parking spot.

64.    When Lipscomb ran, on foot, out the back door of his parent's residence, GPD officers had already secured the children reportedly kidnapped.

65.    Detective Sepulveda, Officer Beaver, and Officer Hamorsky gave chase to Lipscomb without reason. Hamorsky called over the radio that Lipscomb was running.

66.    Lipscomb ran to the silver Hyundai that he had shared with Trinity, which was parked nearby, started it, and began to put it in reverse. As Lipscomb was backing out, Officer Hamorsky hit Lipscomb's car window with his fist but did not break the glass.

67.    Mr. Lipscomb initially fled on foot and entered a vehicle; he did not brandish a weapon, make threats, or commit violence against officers prior to entering the car .

68.    Defendant Officers gave chase without formulating a coordinated plan to de-escalate or contain.

69.    Officer Hamorsky saw Officer Ethan Brown attempting to get into

the vehicle from the driver's side through the front door, which was open.

70. Mr. Lipscomb closed the door to the vehicle, and Officer Brown approached with his gun unholstered and pointed directly at Mr. Lipscomb, who was situated in the driver's seat.

71. Officer Brown opened the driver side door, after Mr. Lipscomb started the vehicle.

72. Officer Ethan Brown placed himself in the trajectory of a moving vehicle.

73. Officer Brown had no justification for placing himself in the trajectory of a moving vehicle after the children were secured.

74. Defendant Sepulveda stood to the right of the front bumper, with his firearm pointed at Mr. Lipscomb.

75. According to Officer Hamorsky's statement, he could not confirm if Officer Brown was struck or nearly struck by Lipscomb's vehicle before force was used.

76. After Officer Brown opened the driver's door, Mr. Lipscomb, began to slowly reverse from the parking spot the hyuandai was parked.

77. Defendant Sepulveda knew Lipscomb's car was in reverse because the car began to move slowly out of the parking spot.

78. Defendant Hamorsky placed himself in the trajectory of a vehicle moving in reverse prior to using deadly force on Mr. Lipscomb.

79. When he stood in front of an occupied vehicle, Defendant Sepulveda placed himself in the trajectory of a moving vehicle.

80. As Mr. Lipscomb's vehicle was in reverse, the open driver's side door knocked Officer Brown to the ground.

81.    When Officer Brown placed himself in the trajectory of a moving vehicle with the driver's side door open, he was hit by the driver's side door that he opened.

82.    Mr. Lipscomb reversed out of the parking spot, and he put the car in drive to begin to exit the area.

83.    As Mr. Lipscomb drove forward, Defendant Officers used multiple rounds of deadly force on Mr. Lipscomb from the rear and side of the vehicle driven by Mr. Lipscomb.

84.    Each shooting officer stated that he *assumed* Officer Ethan Brown was somewhere beneath, or immediately in front of, the Hyundai but none of them could see Brown's exact location at the moment they opened fire. Detective Sepulveda admitted he was "*still not able to see the officer that was under the vehicle when he continued to engage.*"

85.    Officer Beaver likewise stated he "*could not see Brown*" once the car began to move, yet continued to discharge twenty-one rounds—including after changing magazines—into the driver's compartment.

86.    Officer Hamorsky confirmed that he only "*saw Brown on the ground … but could not tell how much under the car he was*" before firing three rounds from eight-to-fifteen yards away.

87.    Because no shooting officer visually confirmed Brown's position or condition before, during, or after they fired, their asserted justification rested solely on speculation rather than on an objectively verifiable threat.

88.    All three officers acknowledged that Mr Lipscomb's Hyundai

reversed, struck Brown or the door frame, and then proceeded forward and away, at which point the car's rear and passenger side were exposed to them—not its front bumper.

89. Because Detective Sepulveda, Officer Beaver, and Officer Hamorsky each fired after the Hyundai had cleared their positions and without confirming Brown's whereabouts, the alleged danger had already passed under Waterman and Williams. Their continued volley, therefore, constituted unconstitutional deadly force.[1]

90. The officers' own statements to the SBI prove (a) *none confirmed Brown's exact position when they fired*, and (b) controlling Fourth-Circuit law required them to cease shooting once the vehicle moved beyond them. Their failure to do so makes the use of force objectively unreasonable and supports liability under the Fourth and Fourteenth Amendments.

91. Officer Hamorsky, told the SBI he could not confirm whether there was contact or a deliberate strike on Officer Brown.

92. Despite no continued danger to Officer Brown or other officers, Defendant Officers chased Mr. Lipscomb's vehicle on foot and continued to use deadly force against Mr. Lipscomb.

93. Defendant Officers shot into a moving vehicle, while bystanders in the area observed from their homes.

---

[1] Under Waterman v. Batton,393 F.3d 471, 481 82 (4th Cir. 2005), once a suspect vehicle "passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots." Similarly, Williams v. Strickland, 917 F.3d 763, 770 (4th Cir. 2019) holds that officers may not fire once they are "no longer in the vehicle's trajectory."

94.     Defendant Officers knew that shooting into a moving vehicle could cause the car to careen out of control.

95.     Defendant Officers knew they could not shoot a fleeing suspect from behind, but did so regardless.

96.     Defendant Officers shot a fleeing Mr. Lipscomb as his vehicle was leaving the area from the vehicle's rear and side.

97.     As Mr. Lipscomb began to exit the scene, Detective Sepulveda retrieved his firearm and immediately engaged Lipscomb with 2 rounds to the windshield. Detective Sepulveda was on the right side of the vehicle when he fired on Lipscomb.

98.     Due to the numerous gunshot wounds he sustained, Mr. Lipscomb crashed shortly thereafter before he could exit the area.

99.     Mr. Lipscomb died at the scene.

100.   The underlying reports cited by Defendants post-incident describe a custodial interference, not an active violent felony in progress.

101.   At the time force was used, no officer observed a weapon, heard threats, or witnessed criminal behavior warranting lethal intervention.

**Post-Incident Investigation**

102.   Detective Sepulveda's actions included the risk of harming innocent bystanders or causing collateral damage to nearby vehicles or property.

103.   The use of firearms in a situation involving a moving car can

escalate the level of danger and increase the likelihood of a high-speed chase, putting both law enforcement officers and the public at greater risk.

104.     Defendant Officers knew the children were not in the suspect vehicle at the time of the shooting.

105.     Therefore, there was no hostage, abduction, or exigent circumstance that justified a deadly force response.

106.     As Lipscomb left the parking spot, Detective Sepulveda moved to the rear passenger side, where Lipscomb drove forward. Detective Sepulveda fired 9 more rounds into the vehicle.

107.     The North Carolina State Bureau of Investigation (hereinafter "SBI") conducted an investigation surrounding the shooting death of Lipscomb.

108.     The Medical Examiner determined that a *fatal* projectile entered *"the anterior mid-chest,"* travelled *"front-to-back and obliquely downward to the left,"* and stopped near the left mid-back, with no exit wound.

109.     Detective Juan Sepulveda admitted to State Bureau of Investigation ("SBI") agents that, while standing at the *front-passenger corner* of the Hyundai, he fired his *first two rounds straight through the windshield* from a distance of approximately one–to–two feet.

110.     The front-to-back chest trajectory precisely matches Sepulveda's point of aim through the windshield, confirming that *his lethal bullet was one of the initial shots fired from the vehicle's front-right quarter.*

111.     Sepulveda further conceded that the Hyundai *"began to move,"* cleared the parking space, and was *already driving **forward*** when he

repositioned to the rear passenger side and fired nine additional rounds.

112.  Because the fatal round originated from the front while the vehicle was advancing away (not reversing), deadly force was applied only *after* any alleged backward threat to Officer Brown had ended.

113.  No officer reported seeing a weapon, and Sepulveda acknowledged he could not see Officer Brown when he continued firing; thus, his shots that killed Mr. Lipscomb was delivered *after officers were no longer in the vehicle's path and after the sole claimed danger had dissipated.*.

114.  These facts demonstrate that the officers' continued gunfire—including the lethal chest shot fired through the windshield—occurred once the car was moving forward and away, in direct violation of Fourth-Circuit precedent prohibiting deadly force once the immediate threat has passed.

115.  Detective Juan Sepulveda told the SBI that at no time when he fired 11 rounds did, he see Lipscomb injure another officer with the car, nor did he see an officer on the ground when he continued to engage Lipscomb.

116.  At the point in time at which Defendant Sepulveda actually used force, he was unaware of any threat of deadly force to Officer Brown.

117.  Where Defendant Sepulveda shot at Mr. Lipscomb when Officer Brown was "no longer in the trajectory" of the driver's car, he violated that driver's Fourth Amendment right to freedom from excessive force.

118.  Detective Juan Sepulveda was one to two feet from Lipscomb's vehicle when he began firing and did not know how far away, he was when he fired his last round.

119. Detective Juan Sepulveda told the SBI that he did not know if Lipscomb was armed.

120. Without knowledge of whether Lipscomb posed a direct threat to the officers' safety, Detective Sepulveda's use of lethal force becomes even more questionable, potentially raising issues of his liability surrounding the incident.

121. At the same time Detective Sepulveda fired on Lipscomb, Officer Beaver removed his pistol from his holster, saw Lipscomb in the driver's seat, and began to fire from 7 feet away, directly into where Lipscomb was sitting.

122. Officer Beaver fired 21 rounds with his duty weapon – a Sig Sauer P226 pistol. Officer Beaver was towards the back of Lipscomb's vehicle when he was shooting Lipscomb. Officer Beaver completed a magazine change and left the empty magazine on the ground.

123. Officer Beaver admitted to firing 21 rounds at Lipscomb's vehicle, including multiple volleys as the vehicle moved away from the officers. Beaver reloaded his weapon mid-engagement, demonstrating a sustained, not reflexive, use of deadly force.

124. Officer Beaver previously stated he could hear more gunshots to his right, which is where Detective Sepulveda was shooting at Lipscomb. Officer Beaver continued to use force despite seeing the taillights on Lipscomb's car.

125. Because Defendant Beaver's use of force was willful, reckless, and malicious, and because municipal insurance does not cover punitive damages or liability arising from intentional misconduct, he may face personal exposure for any damages awarded in this action.

126.  Officer Hamorsky fired 3 rounds into Lipscomb's car at roughly eight yards using his duty weapon, a Smith and Wesson M&P .45. Officer Hamorsky stated to the SBI that from when he fired his first shot to the time, he fired his third shot, Lipscomb's car was *fifteen yards away*.

127.  Officer Hamorsky shot at a moving vehicle that drove away from him, not towards him. At no time did Hamorsky face the driver head-on and instead shot into the vehicle from the side. Officer Harmorsky admitted to the SBI that Officer Brown was run over **before** he fired his weapon.

128.  Officer Hamorsky also told the SBI he was aiming at the driver's seat of Lipscomb's car and that there was no use of force on Lipscomb before Lipscomb got into the car.

129.  Officer Hamorsky told the SBI that he did not see Lipscomb armed with a weapon like a gun or a knife.

130.  While Officer Beaver fired multiple rounds at Lipscomb from close range, Officer Hamorsky fired three rounds from a greater distance.

131.  Officer Beaver stated that he *continued to use force despite seeing the taillights on Lipscomb's car,* whereas Officer Hamorsky claimed he did not see Lipscomb armed with a weapon before Lipscomb got into the car. Officer Beaver's fatal shots entered Lipscomb's body from the rear of the vehicle.

132.  When Lipscomb was shot and killed by GPD officers, he was unarmed and posing no threat to law enforcement or others.

133.  Defendant Officers knew it was clearly established on July 20, 2022, that shooting a fleeing motorist, who is no longer an immediate threat is

unconstitutional. *See Waterman v. Batton*, 393 F.3d 471, 481–82 (4th Cir. 2005) (deadly force unlawful once threat has passed); *Williams v. Strickland*, 917 F.3d 763, 769–70 (4th Cir. 2019) (officers may not shoot once they are no longer in the vehicle's trajectory); *Krein v. Price*, 596 F. App'x 184, 188–90 (4th Cir. 2014) (denying qualified immunity where officer fired through passenger window after stepping aside); *Gallmon v. Cooper*, 801 F. App'x 112, 115–16 (4th Cir. 2020) (genuine dispute where officer fired into side of car after danger passed); *Doriety ex rel. Est. of Crenshaw v. Sletten*, 109 F.4th 670, 680–81 (4th Cir. 2024) (deadly force against a fleeing vehicle moving away is unconstitutional); *Lee v. Town of Seaboard*, 863 F.3d 323, 329 (4th Cir. 2017) (denying immunity where officer fired into side of a slow-moving car that no longer posed a threat).

134.    Officer Ethan Brown placed himself in grave danger when he positioned himself inside the driver's door of a parked vehicle that a suspect ran to in an attempt to flee law enforcement.

135.    Officer Sepulveda admitted to the SBI that the children who had earlier been reported as kidnapped were safely secured and in the custody of their mother.

136.    Defendant Officers initiated contact with Lipscomb by suddenly converging on him as he ran through the parking lot.

137.    Rather than setting up containment, using verbal persuasion, or employing less-lethal options, officers pursued Lipscomb on foot and moved aggressively to surround him at his parked vehicle.

138.    The officers failed to issue coordinated commands or warnings

before opening fire.

139. Officer Hamorsky confirmed that Trina Adams had custody of her two sons. He told the SBI that he saw the kids coming out of Lipscomb's parents' home on Edgemont before the shooting.

140. Officer E. Brown dangerously attempted to get inside a vehicle from the driver's side door while it was in reverse and yelled at Lipscomb to get out of the car.

141. Detective Sepulveda and Officer Hamorsky's statements to the SBI corroborate the fact that the children were already safe and with their mother, indicating that there was no immediate threat or urgency for Officer Brown to engage with Lipscomb.

142. None of the GPD Officers had any information about Lipscomb's possession of a weapon. Nor did GPD officers possess any information that Lipscomb had a violent history against law enforcement or a propensity for violence towards others.

143. At no point did Lipscomb brandish a weapon, threaten officers, or make verbal threats. He entered the vehicle and attempted to drive away, not toward the officers. Defendant Officers had no reason to believe Lipscomb was armed or had committed a violent felony.

144. Defendant officers violated Mr. Lipscomb's Fourth Amendment rights to the extent that they started to use deadly force or continued to use deadly force once the car had driven by them— i.e., once it was no longer reasonable for them to believe that the car was about to run them (or their

fellow officers) over.

145.    Mr. Lipscomb's right to be free from deadly force once officers were no longer in his car's trajectory was clearly established in 2012.

**Forensic and Autopsy Findings**

146.    Defendants fired their weapons at Mr. Lipscomb's moving vehicle when the vehicle did not pose a danger to the officer or others.

147.    It is irrelevant that Defendants Hamorsky, Beaver, and Sepulveda subjectively believed Mr. Lipscomb intended to strike Officer Brown with his vehicle.

148.    On July 20, 2022, Defendants knew an officer may not fire at a moving vehicle when the vehicle does not pose a danger to the officer or others.

149.    Defendant Officers knew the Fourth Circuit has held as early as 2005 that shooting into a vehicle when there was no threat the vehicle was being used as a weapon violates the 4th Amendment. See Waterman v. Batton, 393 F.3d 471, 481-82 (4th Cir. 2005) (reviewing shooting that occurred in the approximately six-second period, the Court concluded "once [decedent's] vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots;" "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

150.    Defendants' fatal gunshots into the side of Lipscomb were unconstitutional.

151.    On July 20, 2022, Defendant Officers knew force justified at the beginning of an encounter is not justified, even seconds later, if the justification for

the initial force has been eliminated.

152. Defendants' fatal gunshots into the rear of Lipscomb were unconstitutional.

153. Following the incident on July 20, 2022, the Estate of Jason B. Lipscomb commissioned an independent autopsy following the death of Lipscomb. (Exhibit A).

154. One of the fatal rounds entered Jason Lipscomb's front chest and travelled front-to-back." Others were to Mr. Lipscomb's head, rear, and side.

155. Neither the autopsy or SBI report shows gunpowder, stippling, or close-range residue was found on the body, indicating that all shots were fired from a distance. This confirms that no physical threat existed at close range, and that officers fired at a distance as the vehicle moved away.

156. The Medical Examiner's preliminary summary of circumstances surrounding the death indicates

157. The Medical Examiner's Autopsy Report confirms that officers continued to fire even after Mr. Lipscomb had been mortally wounded, and after any arguable threat had passed.

158. A projectile path ended near the mid-back of Mr. Lipscomb; no bullet was recovered during the autopsy.

159. According to the Medical Examiner, the fatal shot to Mr. Lipscomb entered the chest and exited through the back, while additional

wounds were sustained to the cheek, hands, and both calves. The trajectories of these wounds establish that Mr. Lipscomb was shot from the side and rear, consistent with retreat—not aggression.

160.    After the initial impact with Officer Brown, Lipscomb's vehicle continued forward and came to rest approximately 30 yards away.

161.    Defendant Officers were not in the trajectory of the vehicle during the volley.

162.    Defendant Officers knew per *Waterman v. Batton* and *Williams v. Strickland,* shooting at a vehicle after it passes officers and poses no threat is unconstitutional.

163.    In <u>Williams v. Strickland</u>, 917 F.3d 763 (4th Cir. 2019), the Fourth Circuit of United States Court of Appeals held that:

> **Officers had violated the Fourth Amendment to the extent that they started to use deadly force, or continued to use deadly force, once the car had driven by them—i.e., once it was no longer reasonable for them to believe that the car was about to run them (or their fellow officers) over. This was true even though mere seconds separated the point at which deadly force was lawful from the point at which deadly force was unlawful. As we put it then, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."**

164.    The state of North Carolina is in the Fourth Circuit.

165.    There is no evidence that Defendant officers warned Lipscomb that they would use deadly force if he did not comply.

166.    No time was provided for surrender, and the decision to use deadly force was immediate and escalated within seconds of the encounter.

167. Officer Brown was not interviewed by SBI without an attorney.

168. Upon information and belief, there is a lack of definitive visual confirmation from Defendant officers and their body cam footage regarding the impact or intent.

**GPD Policy Violations**

169. These autopsy findings demonstrate that the trajectory, volume, and timing of shots all point to an unconstitutional use of deadly force against a retreating and unarmed individual, consistent with the holdings in *Waterman*, *Williams*, and *Doriety*.

170. None of the Defendants stated to the SBI or otherwise that Lipscomb drove his vehicle at an officer.

171. The location of the shell cases and number of rounds shot at Lipscomb at the scene indicate Defendants continued to fire at Lipscomb's vehicle as it passed them.

172. On the scene photos show that officers fired at the side and rear of the vehicle.

173. Officer Beaver admitted to seeing the rear taillights come on and knowing the car was about to move.

174. There was no justification for the callous use of force displayed by GPD Officers.

175. The Gastonia Police Department's Use of Deadly Force Policy is 800.08.05.

176. The Gastonia Police Department's Use of Deadly Force Policy

instructs GPD officers not to discharge his or her firearm "at or from a moving vehicle unless deadly force is being used against the officer or another person and the officer reasonably believes that no other option is reasonably available."

177.    The Gastonia Police Department's Use of Deadly Force Policy states, "discharging a firearm in this circumstance is never authorized when it is reasonable to believe that the vehicle may contain an innocent passenger or it is reasonably apparent that the car may careen out of control and injure an innocent bystander."

178.    At the time Detective Juan Sepulveda, Officer Jason Lee Beaver, and Officer Harrison Hamorsky discharged their firearms, Lipscomb was attempting to drive away from the scene – not strike an officer with the vehicle.

179.    When confronted with an oncoming vehicle, GPD policy instructs officers not to position him or herself in a car's path and instead take all reasonable steps to move out of the way. Officer Brown did not do that here. Officer Brown's failure to follow GPD's policy and move out of the way when confronted with a potential moving vehicle raises serious concerns about his judgment and adherence to GPD protocol.

180.    By the other officers discharging their firearms in a situation where innocent bystanders could have been harmed, the officers here displayed a reckless disregard for public safety and potentially endangered the lives of others.

181.    Defendants were unaware of any active arrest warrants for Lipscomb on July 20, 2022. Allegations against him were based on that Lipscomb had sold drugs on two separate occasions in Dare County in mid-March and late

March of 2021.

182. The allegation of kidnapping is considered a violent felony in North Carolina. Additionally, GPD did not possess any information that Lipscomb possessed any weapons. Further GPD did not possess any information that Lipscomb had a violent history against law enforcement or a propensity of violence towards others.

183. When GPD engaged in a foot pursuit, Lipscomb's hands were visible to the law enforcement officers, and he did not possess any object at that time.

184. Notwithstanding the fact that Lipscomb had not been accused of committing any violent felonies, that no intelligence existed that Lipscomb was known to possess any weapons, and that no intelligence existed that Lipscomb had a propensity for violence towards law enforcement or others, Lipscomb was confronted by several members of the GPD with deadly weapons being pointed at him coupled with loud shouting and profanity directed towards him.

185. Due to such an unwarranted confrontation, Lipscomb was startled and afraid. Subsequently, in an attempt to escape, Lipscomb placed his vehicle in reverse and backed away from the law enforcement officers. At no time were any members of the GPD in any imminent threat of harm or injury from Lipscomb or his vehicle.

186. Next, Lipscomb placed his vehicle in drive and purposely turned his vehicle leftward negotiating his vehicle to avoid all law enforcement

members. At no time were any members of the GPD in any imminent threat of harm or injury from Lipscomb or his vehicle as he drove his vehicle away from law enforcement.

187.    During the course of his retreat, a member of the GPD fired his weapon into the front windshield of Lipscomb's vehicle. At the time that shot was fired, no members of the GPD were in any imminent threat of harm or injury by Lipscomb or his vehicle.

188.    As Lipscomb's vehicle was passing by the law enforcement officers at a low rate of speed, multiple shots were fired by some of the individual Defendants into Lipscomb's vehicle. At no time were any members of the GPD in any imminent threat of harm or injury by Lipscomb or his vehicle.

189.    As Lipscomb's vehicle gained a considerable distance away from the law enforcement officers, multiple shots were fired into the rear of Lipscomb's vehicle by members of the GPD. At that time, no members of the GPD were in any imminent threat of harm or injury by Lipscomb or his vehicle.

190.    As a result of members of the GPD's intentional and reckless disregard of the life and safety of Lipscomb, Lipscomb's vehicle was riddled with bullets.

191.    Lipscomb sustained multiple gunshot wounds to his right arm and a fatal gunshot wound to his face as he drove away from law enforcement. At the time Lipscomb was shot, Lipscomb did not pose any threat or harm to any members of the GPD.

192.    Lipscomb died as a result of members of the GPD's intentional and

reckless disregard of his life and safety on July 20, 2022.

193. If any threat initially existed, the threat clearly ceased once Lipscomb drove by Defendants and Officer Brown and distanced his vehicle away from them. However, the shooting officers intentionally and deliberately discharged their weapons into Lipscomb's vehicle. Approximately fourteen rounds struck Lipscomb's vehicle, and one round struck a nearby residence.

194. Officer Hamorsky stated to SBI investigators that Officer Brown had already been run over *before* he discharged his weapon. In contrast, Officer Beaver justified his continued use of deadly force by referencing a perceived ongoing threat to fellow officers. These statements suggest materially different accounts of the threat timeline.

195. Officer Beaver fired 21 rounds—including after conducting a magazine reload—while positioned behind the vehicle. This extended engagement contradicts Officer Hamorsky's admission that he fired only after Brown was already no longer in danger. The disparity in the quantity and duration of force used further suggests differing levels of perceived justification among the defendants.

196. In sworn statements to the State Bureau of Investigation, Defendant officers contradicted one another regarding key facts—such as whether Officer Brown remained under the vehicle, the direction the vehicle was moving, and whether any officer was in the path of danger. These factual inconsistencies not only undermine Defendants' credibility but also eliminate any plausible justification for the continued use of lethal force.

197.     To the extent any officer witnessed the excessive force used by another, they had a duty to intervene. That no such intervention occurred, despite ample opportunity, creates additional bases for individual liability and underscores diverging responsibilities and roles among the officers.

198.     Upon information and belief, each Defendant was trained on GPD Policy 800.08.05, which prohibits shooting at or from a moving vehicle unless deadly force is being used against the officer or others, and even then, only when no other option is reasonably available. The officers' independent decisions to violate that policy—at different angles, distances, and times—further illustrate individualized decision-making and potential conflicts of interest in any unified defense.

199.     Officer Sepulveda admitted he did not see any officer on the ground, nor any officer being struck by the vehicle, and acknowledged he fired while the vehicle was already moving past him. Meanwhile, Officer Beaver stated he was responding to perceived danger posed to others. These inconsistent accounts highlight individualized perceptions of threat and suggest potential blame-shifting among the involved officers.

200.     Notably, the GPD Use of Force Policy 300.4.1 <u>MOVING</u> <u>VEHICLES</u> states the following:

> **Shots fired at or from a moving vehicle involve additional considerations and risks and are rarely effective. When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.**
> **A deputy should only discharge a firearm at a moving vehicle or its occupants when the deputy reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the deputy or others.**

**Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.**

201. A forensic pathologist determined that in view of the clinical history and the autopsy findings, the cause of death in this Black male, Jason Lipscomb, is multiple gunshot wounds of the head, trunk, and the extremities. The pathologist also listed the manner of death as homicide.

202. At all times relevant, Defendants, were acting under color of state law in their capacities as a law enforcement officer employed by GPD.

203. Given the divergent officer statements and differing factual circumstances surrounding the use of deadly force, Plaintiff files suit against each individually.

204. Defendant Sepulveda admitted he never saw Lipscomb strike anyone. Hamorsky said Brown was already run over before he fired. Beaver continued firing despite seeing taillights.

205. Autopsy shows entry wounds to Lipscomb's side and back. Officers were on the passenger side and rear. Statements conflict as to whether they were behind, alongside, or in danger.

206. Beaver fired 21 rounds, reloaded, and admitted seeing taillights. Sepulveda fired from the side. Hamorsky fired 3 shots after Brown had already been struck.

207. Forensic reports, shell casing placement, and officer admissions suggest most shots occurred after the vehicle began moving away.

208. Jason Lipscomb was shot multiple times by law enforcement

while attempting to flee in a vehicle.

209.     Autopsy findings confirm at least three perforating gunshot wounds and significant internal trauma including lacerations to the aorta, pulmonary artery, and left atrium of the heart.

210.     Eyewitness statements and officer interviews confirm that Mr. Lipscomb was driving away—not toward—officers at the time of the majority of shots fired.

211.     Officer Sepulveda admitted he fired multiple rounds after the vehicle was already in motion and after the officer believed another officer had already been run over.

212.     Officers had safely recovered the children before encountering Mr. Lipscomb. He was unarmed, and no officer saw him brandish a weapon. Officers surrounded the vehicle and opened fire as it moved away from them. The autopsy shows fatal wounds from the side and rear, confirming that officers fired into a retreating, non-threatening vehicle.

213.     Officer Sepulveda admitted to the SBI that he never saw Lipscomb strike another officer and that no officer was under the vehicle when shots were fired. Officer Beaver continued to shoot even after seeing the vehicle's taillights illuminated. Officer Hamorsky fired from the side of the vehicle and acknowledged Lipscomb never threatened him with a weapon.

214.     Defendants Beaver, Sepulveda, and Hamorsky—were full-time members of the Gastonia Police Department's Field Services Division at the time of the shooting, with years of experience ranging from 4 to over 15 years.

215. Defendants Beaver, Sepulveda, and Hamorsky—were not junior or improperly trained officers, but seasoned law enforcement agents acting under City policy.

216. Deputy Matthew Pierce Williams, with the Gaston County Sheriff's Office, advised the car door closed and Lipscomb put the car in reverse.

217. Deputy Williams did not see Lipscomb back over GPD Officer E. Brown.

218. Deputy Williams saw Defendant Sepulveda with his handgun out moving toward the passenger side of the vehicle when he heard gunshots. Officer Beaver was near the back driver's-side quarter panel and had his gun out and appeared to be shooting.

219. Deputy Williams said the only two officers he saw shoot was Defendant Sepulveda and Officer Beaver. Deputy Williams did not know how many shots were fired, but he heard multiple shots.

220. Deputy Williams advised Defendant Sepulveda and Officer Beaver were shooting as the car was backing up, and continued shooting as the car started driving forward.

**Summary of Unjustified Use of Force**

221. On July 20, 2022, the children allegedly abducted were safely recovered and reunited with their mother before any force was used. Detective Sepulveda and Officer Hamorsky both acknowledged seeing the children in

the custody of the complainant before engaging with Mr. Lipscomb.

222.     At no point during the encounter did any officer witness Mr. Lipscomb brandish a firearm or other weapon. Officer Sepulveda admitted to the SBI that he did not see a weapon in Mr. Lipscomb's possession at any time.

223.     Officer Sepulveda admitted that he fired nine (9) rounds into Mr. Lipscomb's vehicle while the vehicle was already moving away and while he could not see Officer Brown or determine whether Brown was still in the vehicle's path.

224.     Officer Beaver admitted to firing twenty-one (21) rounds into the rear of Mr. Lipscomb's vehicle, including after reloading his magazine. He explicitly acknowledged that the vehicle was moving away and that he could no longer see Officer Brown when he continued shooting.

225.     Despite acknowledging that Officer Brown had already been struck and was no longer under the vehicle, Officer Hamorsky fired three (3) rounds from a distance of eight to fifteen yards, aiming into the driver's side of the car as it drove away.

226.     The SBI investigation revealed conflicting accounts among the officers regarding the perceived threat timeline. Officer Hamorsky stated he fired only after Brown had been hit and the vehicle accelerated, while Officer Beaver justified continued fire based on a belief that Brown remained under threat.

227.     At the time Lipscomb was struck with the fatal gunshot wound, the vehicle had cleared the officers' positions, corroborated by the angle of impact (front-to-back and rear-to-front) and shell casing distribution. These facts establish that Mr. Lipscomb was retreating and posed no immediate threat at the time lethal force was

deployed.

228. In light of *Barnes v. Felix*, these tactical decisions and continued use of force after the initial threat dissipated must be evaluated under the totality of the circumstances. The record demonstrates that each officer had an opportunity to reassess and de-escalate—yet each instead chose to engage in an escalating, prolonged use of deadly force.

229. Multiple controlling cases in the Fourth Circuit—*Waterman, Williams, Doriety, Lee, Gallmon, and Krein*—clearly establish that officers may not use deadly force against a fleeing vehicle when they are not in its immediate path and when the threat has passed. As in those cases, the Defendants here fired into the side and rear of a moving car, after the supposed threat to Officer Brown had ended. Under this well-settled law, their conduct was objectively unreasonable and not protected by qualified immunity.

230. Defendant officers discharged their firearms at Mr. Lipscomb's vehicle after it had passed them and posed no imminent threat of death or serious bodily injury to any officer or third party. At no point did any occupant of the vehicle brandish or use a weapon, nor did the vehicle make contact with any officer. National law enforcement standards recognize that discharging a firearm at a moving vehicle—when the vehicle is the sole perceived threat—is unsafe, unjustified, and likely to endanger bystanders, not stop the vehicle.

231. Officers escalated the encounter by positioning themselves in close proximity to a reversing or fleeing vehicle, rather than tactically repositioning to avoid perceived harm. No officer attempted de-escalation or safe

disengagement. Officer Brown, in particular, recklessly approached the driver's side door while the car was reversing—contrary to best practices that warn against placing oneself in a vehicle's path.

232.    No evidence indicated that Mr. Lipscomb posed an immediate threat of death or serious bodily injury to officers or the public at the time shots were fired. The use of deadly force under these circumstances was unnecessary and unreasonable by both constitutional standards and widely accepted use-of-force principles.

233.    Defendant officers discharged over thirty (30) rounds at Mr. Lipscomb's vehicle—without any indication that Lipscomb or his vehicle posed an imminent threat to any officer or bystander. All shots were fired after officers had already recovered the children and positioned themselves around a stationary or slowly moving car.

234.    Officer Beaver reloaded his firearm and fired from the rear of the vehicle. Officer Sepulveda admitted he did not see any weapon or know Officer Brown's position when he continued firing. Officer Hamorsky fired from a lateral angle after the vehicle had passed. These actions mirror the unconstitutional use of force condemned in cases like *Waterman v. Batton*, where courts found it clearly established that firing at a vehicle no longer posing a threat is unlawful.

235.    Best practices and empirical standards warn that firing at a moving vehicle is both tactically ineffective and likely to endanger innocent persons— including the vehicle's occupants, pursuing officers, and bystanders.

236.    Here, Mr. Lipscomb was unarmed, retreating, and struck by seven

bullets, only one of which was fatal. The location of the entry wounds—from the side and rear—confirm that officers violated these standards.

237.    All individual Defendants to this claim, is a person for purposes of 42 U.S.C. § 1983.

238.    All individual Defendants, at all times relevant hereto, were acting under the color of state law in their capacities as an Officer for GPD and their acts or omissions were conducted within the scope of his official duties or employment.

239.    At the time of the complained of events, Lipscomb had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

240.    At the time of the complained of events, Lipscomb had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force. Barnes v. Felix (2025) clarified that such claims must be assessed based on the totality of the circumstances, not merely the officer's momentary perception at the time force was used.

241.    Lipscomb also had the clearly established constitutional right to bodily integrity and to be free from excessive force under a legal framework that considers all relevant circumstances, including prior tactical decisions, availability of de-escalation alternatives, and the proportionality of the response to the threat.

242.    The actions and use of force by all individual Defendants, when viewed in the totality of the circumstances surrounding Mr. Lipscomb's encounter—including their failure to de-escalate, their positioning relative to the moving vehicle, their firing into the side and rear of a fleeing car, and their

knowledge that Lipscomb was unarmed—were objectively unreasonable and violated the Fourth Amendment.

243. The conduct of all individual Defendants was not only excessive, but deliberate and reckless under the broader constitutional standard clarified in *Barnes*. The use of deadly force where Lipscomb posed no immediate threat shocks the conscience and reflects an egregious abuse of state power.

244. The acts or omissions of all individual Defendants were the moving forces behind Lipscomb's death. When properly evaluated under *Barnes*' "totality of the circumstances" test, Defendants' conduct cannot be excused by momentary danger or qualified immunity.

245. Lipscomb also had the clearly established Constitutional right under the Fourth Amendment to bodily integrity and to be free from excessive force by law enforcement.

246. Any reasonable GPD Officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

247. All individual Defendants' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated the Fourth Amendment rights of Lipscomb.

248. All individual Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Lipscomb's federally protected rights. The force used by all individual Defendants shocks the conscience and violated the Fourth Amendment rights of

Lipscomb.

249.    All individual Defendants unlawfully seized Lipscomb by means of objectively unreasonable, excessive and conscious shocking physical force. The force used was deadly force and did cause the death of Lipscomb.

250.    All individual Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Lipscomb's federally protected constitutional rights.

251.    All individual Defendants did so with shocking and willful indifference to Lipscomb's rights and with conscious awareness that it could cause Lipscomb severe bodily harm or death.

252.    The acts or omissions of all individual Defendants were the moving forces behind Lipscomb's injuries. The acts or omissions of all individual Defendants as described herein intentionally deprived Lipscomb of his constitutional rights and caused him other damages. All individual Defendants are not entitled to qualified immunity for his actions.

253.    As a proximate result of all individual Defendants' unlawful conduct, Lipscomb was killed. As a further result of the individual Defendants' unlawful conduct, Lipscomb has incurred special damages, including medical expenses and other special damages related expenses, in amounts to be established at trial.

254.    On information and belief, Lipscomb suffered lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his injuries, in amounts to be ascertained in trial. Plaintiffs are further entitled to

attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

255.    In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Lipscomb. All Defendants are jointly and severally liable for violating Lipscomb's Fourth Amendment Rights.

256.    When viewed under the "totality of the circumstances" standard reaffirmed by *Barnes v. Felix* and the Fourth Circuit's consistent line of excessive force cases involving fleeing vehicles, Defendant officers' conduct reflects a callous disregard for Lipscomb's constitutional rights and supports an award of punitive damages.

257.    Officers continued shooting after taillights were visible, and reloading, shows malice or reckless disregard.

### City of Gastonia Policy, Customs, and Practice

258.    The City of Gastonia has never disciplined or terminated an officer for the use of deadly force in at least a decade—including in the shooting of Jason Lipscomb. Every officer-involved shooting during this period, even those involving unarmed Black civilians, was internally deemed 'Justified.'

259.    Officers operated within a policing culture where racial disparities in use-of-force and complaint outcomes were normalized, ignored, and institutionally reinforced.

260. Public records and internal affairs data from 2013 to 2022 reveal that the Gastonia Police Department exonerated its officers in nearly all complaints involving excessive force, misconduct, or deadly encounters—especially those involving Black complainants.

261. In 2022, one excessive force complaint involving a Black complainant was sustained, and every officer-involved shooting was cleared without independent review or discipline.

262. The City of Gastonia adopted Resolution 1729, which limits recoverable damages in claims of excessive use of force involving governmental immunity and explicitly excludes compensation for emotional distress, pain and suffering, or punitive damages—even where internal policy was violated. This resolution institutionalizes immunity for misconduct and limits civilian recourse.

263. Municipal liability attaches where official policies or the absence of accountability mechanisms give rise to a pattern 'likely to result in the violation of constitutional rights,' as seen here in the City's blanket exoneration of all officer-involved shootings—despite fatalities and unresolved contradictions in use-of-force justification.

264. These policies reflect a de facto municipal practice of ratifying unconstitutional force. Complaints filed by Black civilians were overwhelmingly closed as 'Justified,' 'Unfounded,' or 'Exonerated.' In contrast, complaints by white civilians occasionally resulted in 'Not Justified' or 'Sustained' findings, particularly for non-force allegations like rudeness or code

violations.

265.     From 2013 to 2022, the City deemed eight use of force complaints involving a white person to be 'Not Justified,' use of force, including two deadly force encounters in the year 2013 and 2019. Likewise, the City deemed four physical use of force complaints to be 'Not Justified' use of force in the years 2013, 2020, and 2021. The City deemed one K-9 use of force complaint in the year 2019 to be 'Not Justified' use of force.  The City deemed a use of force complaint involving a taser (2021) as 'Not Justified' against a white person.

266.     In contrast, for the same time period from 2013 to 2022, the City did not find its police officers' use of force as "not justified" in a single use of force complaint filed by a black person.

267.     In 2018 and again in 2022, however, the City merely sustained excessive force complaints raised by Black complainants (two in total, one each year).

268.     All recorded deadly force complaints involving Black civilians from 2019 to 2022—at least twelve (12) separate incidents—were deemed 'Justified.' No case during that period involving a Black civilian was found 'Not Justified' or sustained.

269.     The City of Gastonia had five deadly force complaints involving black citizens and seven in 2022.

270.     Internal affairs logs show that Black complainants had their complaints resolved as 'Justified,' 'Unfounded,' or 'Not Sustained' over 90% of the time, while white complainants were more likely to obtain corrective action—albeit rarely.

271. In 2021, two use-of-force complaints were found the force to be deemed 'Not Justified' and both involved white civilians. Every use-of-force complaint involving a Black civilian that year was deemed 'Justified.'

272. Despite clear racial disparities in traffic stops, vehicle searches, and use-of-force rates—documented by the City's Bias-Based Profiling reports from 2013 to 2022—the City implemented no corrective measures, sustained no bias-related complaints, and took no disciplinary action.

273. From 2013 through 2022, use-of-force incidents were internally reviewed. In 2013, 2019, 2020, and 2021, use of force against a white person were deemed 'Not Justified,' and none involved the shooting of a Black civilian.

274. Internal Affairs case number IA2022-0111 was assigned for the use of deadly force incident involving Jason B. Lipscomb.

275. Internal Affairs case number IA2022-0111 was assigned for the use of force – forced entry against Jason B. Lipscomb.

276. Upon information and belief, Officer Brown used force to open Mr. Lipscomb's driver's side door's side.

277. This pattern of zero accountability, combined with racial disparity in complaint outcomes, establishes a municipal practice of systemic indifference that made the unconstitutional killing of Jason Lipscomb foreseeable and inevitable.

278. The City's refusal to monitor, discipline, or correct officers— despite known disparities and repeated uses of deadly force—created an

environment in which unconstitutional violence was rewarded, and victims were denied justice.

279.    The statistical disparities presented herein—combined with the City's conscious failure to take remedial steps—are not merely reflective of bad outcomes. They represent a systemic culture of selective enforcement and racialized violence, actionable under the Equal Protection Clause of the Fourteenth Amendment.

280.    Lipscomb's death is traceable to the officers' use of force, but municipal liability attaches because the City's final policymakers—either the Chief or City Manager—ratified the act after review. That ratification constitutes an official decision to treat the conduct as lawful.

281.    At all times relevant, the City of Gastonia was responsible for the establishment, implementation, and enforcement of policies governing the conduct of Gastonia Police Department ("GPD") officers, including the use of deadly force, internal complaint review procedures, and officer discipline.

282.    Pursuant to Chapter 3 of the City of Gastonia's Code of Ordinances, the City Manager serves as the City's chief administrative officer, with supervisory authority over all city departments, including GPD. The City Manager is responsible for administering personnel rules and ensuring compliance with municipal policy across departments. This includes final authority over disciplinary outcomes, complaint dispositions, and operational oversight of the Chief of Police.

283.    The Chief of Police is appointed by and operates under the authority of the City Manager and is tasked with the day-to-day management of GPD. At all

relevant times, the Chief of Police exercised de facto final policymaking authority over internal affairs investigations, use-of-force reviews, and the adjudication of officer conduct complaints unless otherwise overridden by the City Manager.

284. Following the fatal shooting of Jason Lipscomb, the Gastonia Police Department initiated an internal review. Upon information and belief, that review was completed without referral for external investigation or discipline. The City Manager and/or Chief of Police ratified the officers' conduct by concluding that the use of deadly force was in accordance with departmental policy and state law.

285. The City of Gastonia, through its City Manager and/or Chief of Police, declined to impose discipline, implement policy reform, or acknowledge fault, and thereby affirmatively ratified the unconstitutional use of deadly force. These acts and omissions constitute official policy.

286. The City's decision to justify the officers' conduct in the face of a clearly excessive use of deadly force reflects a deliberate choice by officials with final authority and serves as evidence of an official municipal policy that deprived Mr. Lipscomb of his constitutional rights under the Fourth and Fourteenth Amendments.

**When the City of Gastonia Police Department's Internal Accountability Depends on Who You Are: A Decade of Disparity**

287. Mr. Lipscomb, a young Black man, was treated differently than similarly situated individuals who are not Black.

288.    In particular, he was subjected to deadly force without a warrant, without evidence of a weapon, and while attempting to flee, in circumstances where a non-Black individual would not likely have been met with such escalation.

289.    Black civilians in Gastonia, North Carolina, are disproportionately impacted by law enforcement officers' use of deadly force, including firearm discharges.

290.    From 2013 through 2022 the City logged at least 298 use-of-force complaints from Black civilians and at least 336 from White civilians. Only two (2) Black complaints were ever ruled "Sustained." Complaints filed by white persons received eight rulings of "Not Justified" and one "Sustained" (1).

291.    Every officer-fault ruling in a deadly-force investigation during that same decade involved a White complainant.  No deadly-force complaint lodged by a Black civilian was ever credited.

292.    For the year 2013 – there were at least thirty-eight (38) Black complaints involving use-of-force, at least thirty-five (35) White. Zero such Black complaints were credited. Two (2) White complaints—including one firearm discharge—were ruled "Not Justified."

293.    For the year 2016 – At least twenty-two (22) Black complaints involving use-of-force were lodged, at least thirty-five (35) White. None of these complaints were sustained; no deadly-force complaint was credited.

294.    For the year 2017 – At least thirty (30) Black complaints  involved use-of-force allegations, at least twenty-five (25) White. One (1) white complaint was sustained; none involved deadly force.

295. For the year 2018 – At least thirty-two (32) Black complaints raising use-of-force allegations were submitted, at least forty-four (44) White. One (1) Black complaint were sustained. A single firearm-discharge case involving both a Black and a White complainant was logged as "Accidental," yielding no credited finding for either.

296. For the year 2019 – At least twenty (20) Black complaints involving use-of-force were lodged, at least forty-three (43) White. Zero Black such complaints were sustained. Two (2) White complaints were credited; the year's only "Not Justified" deadly force finding (Case No. 2019-0190) involved a White civilian. The other "Not Justified" finding involved use-of-force of a K9 on a White civilian.

297. For the year 2020 – At least nineteen (19) Black complaints raised use-of-force allegations, thirty (30) White. Only two (2) White complaints received the ruling the physical use-of-force used was "Not Justified;" no deadly-force complaint was credited.

298. For the year 2021 – the only two use of force incidents reviewed by internal affairs and determined to be 'Not Justified' involved white men. The IA Case files for those matters are IA2021-0003 and IA2021-0196.

299. Across the ten-year span, Black civilians never obtained a favorable ruling in a deadly-force case, while White civilians did so on two occasions (2013 & 2019). This consistent disparity underscores selective enforcement and supports the Equal Protection claim.

300. The City's consistent failure to sustain any bias-related complaint,

coupled with the exoneration of every officer in every shooting of a Black civilian across a decade, reflects a pattern of municipal conduct that violates the Equal Protection Clause.

301.     Annual 'Bias-Based Patterns' reviews from 2013 through 2022 reveal that although Black residents make up roughly 29 % of Gastonia's population, the Police Department stopped Black motorists in at least 40 % of all traffic stops every single year, peaking at 46.6 % in 2022. In each year studied, the Department also searched Black drivers at a rate significantly higher than White drivers. The reviews expressly concede these disparities (e.g., 2013, 2014, 2016, 2018) yet dismiss them as non-probative and implement no remedial measures."

302.     "The City's policymakers therefore had actual notice of racially skewed enforcement actions resembling the racially skewed force-investigation outcomes alleged herein. Their consistent refusal to address the problem—other than to issue conclusory statements of 'no evidence of bias'—constitutes deliberate indifference and ratifies a municipal custom of discriminating against Black residents in violation of the Equal Protection Clause.

303.     In the aftermath of the fatal shooting of Jason Lipscomb, the City Manager exercised this authority by reviewing the incident and affirmatively concluding that the involved officers acted in conformity with Gastonia Police Department use-of-force policy and applicable law. No officer was disciplined or referred for independent review despite the shooting involving firearm discharges into the rear and side of a vehicle after the immediate threat had passed.

304.     The City Manager's decision constituted a final municipal act,

undertaken by an official with delegated authority to set policy and determine whether conduct by City officers was lawful or justified. As such, the City Manager's ratification of the use of deadly force against Mr. Lipscomb is attributable to the City itself for purposes of Monell liability.

305. The City of Gastonia's express ratification of the shooting, through its final policymaker, satisfies the second prong and supports Monell liability.

306. The City cannot escape liability where, as here, the injury was inflicted not by rogue actors but by officers whose conduct was affirmatively adopted and defended by the City's designated decisionmaker, rendering the actions those "whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

307. Defendants' actions were not only unreasonable under the Fourth Amendment but also reflected a denial of equal protection under the law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

308. As a direct and proximate result of this racially discriminatory treatment, Plaintiff suffered the death of her son, along with associated damages, for which she now seeks relief.

<u>CLAIMS FOR RELIEF</u>

**FIRST CLAIM FOR RELIEF**

(42 U.S.C. § 1983 Excessive Force)
(Against Defendant Officer Juan Sepulveda in his
Individual Capacity)

309. Plaintiff realleges and incorporates herein by reference each and every allegation contained in this Complaint.

310.     This cause of action is brought against Officer Juan Sepulveda in his individual capacity.

311.     At all relevant times, Officer Juan Sepulveda was acting under color of state law as a sworn law enforcement officer with the Gastonia Police Department. Officer Juan Sepulveda discharged his firearm at Jason B. Lipscomb under circumstances where Mr. Lipscomb posed no immediate threat to the safety of the officers or others. On July 20, 2022, Detective Juan Sepulveda of the Gastonia Police Department discharged his firearm eleven times at Jason B. Lipscomb, including nine shots after Mr. Lipscomb's vehicle had already begun driving forward-away from the officers-and the perceived threat had subsided.

312.     At the time Sepulveda began shooting, Mr. Lipscomb was seated in his vehicle and attempting to flee. Sepulveda was positioned at the front passenger side of the Hyundai, and Officer Ethan Brown-whom Sepulveda believed might have been run over-was no longer visible.

313.     Despite never personally seeing Brown under the vehicle, Sepulveda fired two rounds through the front windshield from a distance of one to two feet, then repositioned himself to the rear passenger side and discharged nine additional rounds.

314.     Sepulveda admitted he could not see Brown's body when he continued firing. He did not pause to assess whether the threat to Officer Brown-or anyone-persisted. He continued shooting even as the vehicle drove away.

315.     Sepulveda stated that he never saw a weapon on Mr. Lipscomb and had no information confirming that Lipscomb was armed.

316.     The subject children had already been returned safely to their mother. Officers were not aware of any active arrest warrants issued for Mr. Lipscomb at the time. Sepulveda's only basis for firing was a fleeting and unconfirmed assumption that Officer Brown may have been run over.

317.     At no time was Sepulveda directly in the vehicle's path. He was not threatened by the vehicle's movement and never alleged that Mr. Lipscomb tried to strike him.

318.     Sepulveda had no body-worn camera and made no audible attempt to warn Lipscomb before firing. He did not deploy his taser or other less-lethal tools, admitting he did not carry them.

319.     Sepulveda's use of deadly force was excessive and objectively unreasonable in light of the totality of the circumstances. He discharged eleven rounds in rapid succession into the side and rear of a fleeing vehicle, without confirming that any officer remained at risk or that Mr. Lipscomb posed an immediate threat of death or serious bodily harm.

320.     As held in Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), an officer's use of deadly force is unreasonable when the suspect no longer poses a threat. Under Barnes v. Felix, 601 U.S. ___ (2025), courts must evaluate the totality of the encounter-not just the moment of the trigger pull.

321.     Sepulveda admitted that he fired multiple rounds after the vehicle was already in motion and that he did not know where Brown was until after the shooting ended. These facts preclude qualified immunity and support liability under the Fourth Amendment.

322.     Mr. Lipscomb suffered multiple gunshot wounds and later died as a result. Sepulveda's unconstitutional use of force was a direct and proximate cause of Mr. Lipscomb's death, causing pain, suffering, and irreparable loss to his family.

323.     Based on the totality of the circumstances—including but not limited to Mr. Lipscomb's lack of weapon, the trajectory of the vehicle away from officers, and the post-incident statements of the involved officers—Officer Juan Sepulveda's use of deadly force was objectively unreasonable, excessive, and violated Mr. Lipscomb's clearly established rights under the Fourth Amendment.

324.     As a direct and proximate result of Officer Juan Sepulveda's conduct, Mr. Lipscomb suffered fatal injuries. Plaintiff seeks compensatory and punitive damages, attorneys' fees under 42 U.S.C. § 1988, and any other relief this Court deems just.

## SECOND CLAIM FOR RELIEF

(42 U.S.C. § 1983 Excessive Force)
(Against Defendant Officer Jason Lee Beaver in his
Individual Capacity)

325.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in this Complaint.

326.     This cause of action is brought against Officer Jason Lee Beaver in his individual capacity.

327.     On July 20, 2022, Defendant Officer Jason Beaver, while acting under color of state law and within the scope of his duties as a Gastonia police officer, used deadly force against Jason B. Lipscomb without legal justification and in violation of Mr. Lipscomb's clearly established rights under the Fourth Amendment to the United States Constitution.

328.     At the time of the encounter, Mr. Lipscomb was unarmed, alone, and attempting to leave a residential parking lot in a vehicle. Officers had no knowledge of an active warrant for his arrest, no evidence that he posed a threat of serious physical harm, and no reason to believe he was armed or dangerous.

329.     Officer Beaver and other officers were aware that the children Lipscomb was accused of abducting had already been safely returned to their mother and were not inside the vehicle.

330.     Without issuing any verbal warning or lawful command, and without giving Mr. Lipscomb any opportunity to surrender or comply, Officer Beaver discharged his service weapon at Mr. Lipscomb while he was seated in the driver's seat of his vehicle.

331.     Officer Beaver fired approximately 21 rounds at Mr. Lipscomb-striking him multiple times-including through the side and rear of the vehicle as it drove away from officers and posed no immediate threat.

332.     Officer Beaver acknowledged reloading his firearm and continuing to shoot, even after the vehicle had moved past him and Officer Brown, and was no longer in close proximity to any officer.

333.     Autopsy findings confirm that Mr. Lipscomb suffered multiple gunshot wounds, consistent with being struck while fleeing and not while driving toward any officer.

334.     No weapon was found on Mr. Lipscomb or in his vehicle. None of the officers, including Beaver, ever claimed that Mr. Lipscomb pointed a weapon or threatened anyone with force.

335.     Officer Beaver's use of deadly force was objectively unreasonable, unnecessary, excessive, and grossly disproportionate to the threat, if any, that Mr. Lipscomb posed. His actions were taken after any potential threat had passed and at a time when Mr. Lipscomb was clearly attempting to flee.

336.     Taking into account the Supreme Court's totality of circumstances test it reaffirmed in Barnes v. Felix, 601 U.S. ___ (2025), and the Fourth Circuit's prior holdings in Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), and Williams v. Strickland, 917 F.3d 763 (4th Cir. 2019), it was clearly established that shooting a suspect who is fleeing in a vehicle and no longer poses an imminent threat violates the Fourth Amendment.

337.     A reasonable officer in Officer Beaver's position would have known that firing repeated rounds into the side and rear of a fleeing vehicle, without

warning, and after the suspect had moved away from officers, was unconstitutional.

338.    As a direct and proximate result of Officer Beaver's unlawful and excessive use of force, Mr. Lipscomb suffered conscious pain and suffering and ultimately died from his injuries.

339.    At all relevant times, Officer Jason Lee Beaver was acting under color of state law as a sworn law enforcement officer with the Gastonia Police Department. Officer Jason Lee Beaver discharged his firearm at Jason B. Lipscomb under circumstances where Mr. Lipscomb posed no immediate threat to the safety of the officers or others.

340.    Based on the totality of the circumstances—including but not limited to Mr. Lipscomb's lack of weapon, the trajectory of the vehicle away from officers, and the post-incident statements of the involved officers—Officer Jason Lee Beaver's use of deadly force was objectively unreasonable, excessive, and violated Mr. Lipscomb's clearly established rights under the Fourth Amendment.

341.    As a direct and proximate result of Officer Jason Lee Beaver's conduct, Mr. Lipscomb suffered fatal injuries. Plaintiff seeks compensatory and punitive damages, attorneys' fees under 42 U.S.C. § 1988, and any other relief this Court deems just.

### THIRD CLAIM FOR RELIEF

(42 U.S.C. § 1983 Excessive Force)
(Against Defendant Officer Harrison Hamorsky in his
Individual Capacity)

342.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in this Complaint.

343.     This cause of action is brought against Officer Harrison Hamorsky in his individual capacity.

344.     On July 20, 2022, Officer Harrison Hamorsky of the Gastonia Police Department used deadly force against Jason B. Lipscomb by discharging his service firearm three times into Lipscomb's vehicle as Lipscomb attempted to drive away from officers.

345.     Officer Hamorsky approached Mr. Lipscomb's vehicle on foot and struck the passenger-side window with his fist. He then drew his firearm and aimed directly at the driver's seat.

346.     According to Hamorsky's own statement, Mr. Lipscomb was reversing away from the scene and then accelerated forward at the time of the shooting. Officer Ethan Brown had already fallen away from the vehicle and rolled across the road when Hamorsky fired.

347.     Hamorsky admitted he was eight yards away when he fired the first shot, and the vehicle was fifteen yards away when he fired the third. He further acknowledged that Mr. Lipscomb was "getting so far away" and civilians were emerging from nearby houses, which caused him to stop firing.

348.     Officer Hamorsky made no effort to deploy less-lethal alternatives

such as his taser or issue additional commands after Mr. Lipscomb began driving forward. Instead, he used lethal force without confirming the presence of an immediate threat.

349.     Hamorsky fired his weapon after he saw Brown fall down after being hit by the car door and after Mr. Lipscomb drove away.

350.     The children whom officers initially responded to recover had already been safely reunited with their mother. Mr. Lipscomb was unarmed and did not present an imminent threat of serious physical harm at the time Officer Hamorsky fired.

351.     Under clearly established law-including Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), and Williams v. Strickland, 917 F.3d 763 (4th Cir. 2019)-an officer may not continue to use deadly force against a suspect in a fleeing vehicle once the threat has passed and the officer is no longer in the vehicle's trajectory.

352.     As reaffirmed by Barnes v. Felix, 601 U.S. ___ (2025), the Fourth Amendment requires courts to evaluate the totality of the encounter-including officers' tactical decisions before, during, and after the use of force-to determine reasonableness. Officer Hamorsky's own account confirms that Mr. Lipscomb was attempting to flee, not to attack, and was moving away from officers at the time of the shooting.

353.     Officer Hamorsky's use of deadly force under these circumstances was objectively unreasonable, excessive, and in violation of Mr. Lipscomb's clearly

established rights under the Fourth Amendment.

354.     As a direct and proximate result of Officer Hamorsky's unlawful use of force, Mr. Lipscomb suffered fatal gunshot wounds, conscious pain and suffering, and death.

355.     At all relevant times, Officer Harrison Hamorsky was acting under color of state law as a sworn law enforcement officer with the Gastonia Police Department. Officer Harrison Hamorsky discharged his firearm at Jason B. Lipscomb under circumstances where Mr. Lipscomb posed no immediate threat to the safety of the officers or others.

356.     Based on the totality of the circumstances—including but not limited to Mr. Lipscomb's lack of weapon, the trajectory of the vehicle away from officers, and the post-incident statements of the involved officers—Officer Harrison Hamorsky's use of deadly force was objectively unreasonable, excessive, and violated Mr. Lipscomb's clearly established rights under the Fourth Amendment.

357.     As a direct and proximate result of Officer Harrison Hamorsky's conduct, Mr. Lipscomb suffered fatal injuries. Plaintiff seeks compensatory and punitive damages, attorneys' fees under 42 U.S.C. § 1988, and any other relief this Court deems just.

### FOURTH CLAIM FOR RELIEF
(Assault and Battery)
(Against Officer Beaver in his individual and official capacity)

358.     Plaintiff realleges and incorporates herein by reference each and

every allegation contained in paragraphs 1 through 191 of this Complaint.

359.     Defendant Beaver pointed a firearm at Lipscomb and unjustifiably used deadly force against Lipscomb; such force was objectively excessive and unreasonable under the circumstances.

360.     Defendant Beaver's intentional acts as described more fully hereinabove, put Lipscomb in actual, subjective apprehension of immediate harmful or offensive contact.

361.     Lipscomb's apprehension was objectively reasonable under the circumstances in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

362.     Defendant Beaver's actions against Lipscomb were unreasonable and unlawful. At the time Lipscomb was shot by the individual Defendants, Lipscomb did not pose any threat or harm to any members of the GPD. All individual Defendants acted with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of Lipscomb, and was undertaken in bad faith and with actual malice.

363.     As a further direct and proximate result of the conduct described above, Lipscomb died. Prior to his death Lipscomb suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical

expenses for treatment and care. Lipscomb did not consent to contact with, from or by Defendant Beaver.

364.     Defendant Jason Beaver, acting outside the scope of lawful duties and with malicious intent, used unlawful physical force against Jason Lipscomb by discharging his firearm into Lipscomb's vehicle multiple times—continuing even after any threat had passed.

365.     Defendant Beaver acted maliciously and beyond the scope of any lawful authority when he discharged more than 20 rounds into Mr. Lipscomb's vehicle, including after the vehicle was fleeing and posed no threat.

366.     Defendant Beaver reloaded and continued to fire as Lipscomb drove away, knowing that no weapon had been displayed and the children had already been safely recovered. This conduct was done needlessly and with reckless disregard for human life, demonstrating malice.

367.     Defendant Beaver's actions were willful, wanton, and intended to cause harm or carried out with manifest indifference to the consequences, thereby defeating any claim to public official immunity under North Carolina law.

368.     This conduct constitutes assault and battery under North Carolina law and was carried out willfully and maliciously, removing any entitlement to public official immunity.

369.     Upon information and belief, the City of Gastonia has procured

liability insurance and/or participates in a local government risk pool, including the Interlocal Risk Financing Fund of North Carolina (IRFFNC), which provides coverage for claims of the nature alleged herein. This coverage applies to acts of City employees, including Defendant Beaver, alleged to have caused personal injury and constitutional harm. These facts, if true, are sufficient to establish a waiver of governmental immunity pursuant to N.C. Gen. Stat. § 160A-485 and *Anderson v. Town of Andrews*, 127 N.C. App. 599 (1997).

370.    All individual Defendants are jointly and severally liable for their assault and battery towards Lipscomb.

### FIFTH CLAIM FOR RELIEF
42 U.S.C. § 1983 – Municipal Liability (Monell Claim)
(Against the City Manager of Gastonia in his official capacitiy)

371.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

372.    The City Manager operates under the Council-Manager form of government in which a professionally trained City Manager is appointed by the Mayor and City Council to serve as the Chief Administrative Officer for city government. The City Manager manages the day-to-day operations of the overall municipal organization. Based upon adopted ordinances, policies, and budgets by the elected Mayor and City Council, the City Manager is responsible for providing the effective management, supervision, and leadership to city staff necessary for the cost effective delivery of public services.

373.    At all times relevant, Defendant Michael C. Peoples served as the City Manager for the City of Gastonia and acted under color of state law pursuant to N.C. Gen. Stat. § 160A-148, which vests the City Manager with final administrative and supervisory authority over all city departments, including the Gastonia Police Department (GPD).

374.    As City Manager, Mr. Peoples was responsible for ensuring compliance with all state laws, city ordinances, and internal policy standards, and held the final authority to impose or withhold disciplinary action against officers. He also reviewed outcomes of internal investigations concerning the use of force and ensured departmental adherence to applicable laws and policies.

375.    Upon information and belief, Mr. Peoples reviewed the internal investigation following the fatal shooting of Jason Lipscomb and affirmatively determined that the officers involved acted within departmental policy and state law. No corrective action was taken, and no policy reforms were initiated.

376.    Mr. Peoples' decision not to discipline the officers or refer the matter for external review constituted a final policy decision by a municipal official with final policymaking authority. This ratification transformed the unconstitutional use of force into official municipal policy attributable to the City of Gastonia under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

377.    Mr. Peoples' inaction occurred against the backdrop of a documented pattern, spanning from 2013 to 2022, in which every use-of-force

complaint by a Black civilian was dismissed or ruled "Justified," including multiple deadly force cases. Meanwhile, White complainants received favorable findings in less serious cases. Despite access to these patterns through department reports and annual summaries, Mr. Peoples failed to implement any reforms, reflecting **deliberate indifference** to the racial disparities in enforcement outcomes.

378. The decision by the City Manager to adopt and defend the officers' conduct as consistent with City policy, despite its violation of clearly established constitutional standards, renders the City liable under 42 U.S.C. § 1983.

379. At all times relevant, the City of Gastonia was the public employer of Defendants Sepulveda, Beaver, and Hamorsky, and acted under color of state law through its official policies, practices, and customs.

380. The actions of the individual Defendants were undertaken pursuant to a policy, practice, or custom of the City of Gastonia that encouraged, authorized, condoned, or ratified the unconstitutional use of deadly force by its police officers.

381. Specifically, the City has a documented pattern of:

    a.    Determining every officer-involved shooting-including those resulting in the deaths of unarmed individuals-to be "justified" without independent or transparent review;

    b.    Failing to discipline, retrain, or supervise officers involved in such shootings;

    c.    Maintaining racial disparities in traffic stops, vehicle searches,

and arrest rates, without corrective action; and

      d.    Excluding compensation for emotional distress, pain and suffering, or punitive damages in its municipal settlement policy, thereby signaling institutional indifference to civil rights violations.

382.    In the years leading up to Mr. Lipscomb's death, the City sustained zero excessive force complaints, despite multiple shootings and serious misconduct allegations. This unwavering pattern of exoneration reflects a policy of deliberate indifference to the constitutional rights of the public, including the right to be free from excessive force.

383.    The City's failure to implement adequate review, accountability, or discipline policies-combined with its express limitation on recoverable damages in constitutional violation claims-created a foreseeable and proximate cause of the deprivation of Mr. Lipscomb's Fourth and Fourteenth Amendment rights.

384.    For over a decade, the Gastonia Police Department has documented persistent racial disparities in traffic stops, vehicle searches, and field interviews involving African American drivers. In each annual report from 2013 through 2020, the Department's own internal analyses confirmed that Black drivers were stopped, searched, and subjected to field interviews at rates significantly disproportionate to their population share.

385.    Despite acknowledging these disparities in multiple annual reviews, the Department took no meaningful corrective action, sustained zero complaints of racial bias, and failed to implement any monitoring, retraining, or disciplinary

practices to address the issue. This inaction amounts to deliberate indifference and constitutes an official policy or custom under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

386. The City's own records show that Black drivers were stopped at rates between 9% and 15% higher than their share of the population in multiple years and were searched more frequently than White drivers in nearly every analyzed period. In the same timeframe, no racial bias complaint was ever sustained—despite multiple citizen allegations.

387. This systemic disparity and reflexive exoneration created an environment of impunity in which unconstitutional uses of force—such as the fatal shooting of Jason Lipscomb—became foreseeable and inevitable.

388. The unconstitutional shooting of Jason Lipscomb was not an isolated incident but the foreseeable result of the City of Gastonia's longstanding policies, customs, and deliberate inaction regarding racially disparate enforcement and officer use of force. From 2013 to 2020, the City documented repeated and significant racial disparities in traffic stops, vehicle searches, and field interviews—particularly of Black drivers—without implementing any effective corrective measures or accountability mechanisms.

389. Over this multi-year period, Gastonia officers stopped Black drivers at rates as high as 15% above their representation in the city's population. Black motorists were subjected to discretionary searches and field interviews at

disproportionately high rates, often without arrest or citation, and no substantive policy changes followed. These disparities were acknowledged in annual internal reports, yet every racial profiling or biased policing complaint was either exonerated or dismissed as unfounded, reinforcing a pattern of impunity.

390.    The City's deliberate failure to address these disparities or discipline officers for racial profiling or excessive force fostered a culture where officers understood that aggressive enforcement, tactical escalation, and disproportionate use of force against Black civilians would face no consequences. It was within this policy environment that Defendant Officers Sepulveda, Beaver, and Hamorsky confronted Mr. Lipscomb—an unarmed Black man—and fired more than thirty rounds into his vehicle despite no immediate threat to themselves or others.

391.    The City's indifference to its own data, refusal to adopt oversight mechanisms, and routine clearance of deadly force incidents—regardless of the underlying facts—directly contributed to the conduct at issue in this case. But for these municipal customs and practices, it is unlikely that the officers would have chosen to surround, escalate, and execute deadly force on a retreating suspect with such apparent disregard for his rights and life.

392.    Accordingly, the deprivation of Mr. Lipscomb's constitutional rights was caused by policies, practices, and customs of the City of Gastonia, in violation of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

393.    From 2013 to 2022, the Gastonia Police Department recorded

hundreds of use-of-force incidents and dozens of deadly force cases. In that span, every officer-involved shooting of a Black civilian—regardless of whether the subject was unarmed or fleeing—was deemed "Justified." Meanwhile, complaints by Black civilians alleging excessive force or misconduct were overwhelmingly dismissed as "Unfounded" or "Not Sustained," while white civilians occasionally received "Sustained" findings for less severe complaints such as rudeness or code violations. Across this 10-year span, no Gastonia officer was disciplined for using deadly force against a Black civilian.

394. These disparities are statistically stark and substantively unconstitutional. They reflect a municipal pattern of racial bias, selective credibility, and institutionalized exoneration—forming the basis of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and discriminatory enforcement under the Equal Protection Clause of the Fourteenth Amendment.

395. The City of Gastonia's failure to discipline any officer for deadly force over a ten-year period—despite multiple fatalities involving unarmed Black men—reflects a custom 'so permanent and well settled as to constitute a custom or usage with the force of law.

396. These facts go beyond negligence or lax oversight. They demonstrate a deliberate choice by City policymakers to tolerate and normalize unconstitutional conduct.

397. The City of Gastonia has maintained a practice of deeming every

use of deadly force "justified," including those involving unarmed Black men, and has never disciplined an officer for any deadly force incident in at least a decade.

398.    Complaint data from 2013 to 2022 confirms that complaints from Black citizens—particularly for excessive force and conformance to laws—were disproportionately dismissed or not sustained, even when similar complaints by White citizens were more likely to be credited. This systemic disparity, paired with the City's refusal to acknowledge or remedy known racial disparities in stops, searches, and enforcement, created an environment of impunity. These municipal practices and customs directly contributed to the unconstitutional killing of Jason Lipscomb and make the City liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

399.    Although the act of deadly force was initially executed by subordinate officers, the City of Gastonia—through its final policymaker, the City Manager—deliberately reviewed, adopted, and ratified the conduct as lawful. This post-incident ratification transformed the officers' conduct into an official policy decision of the City, thereby rendering the municipality liable under Monell and its progeny.

400.    As a direct and proximate result of the City's unconstitutional policies, customs, and practices, Plaintiff suffered the loss of Jason Lipscomb, and is entitled to damages, including compensatory and punitive damages, and attorneys' fees under 42 U.S.C. ¬ß 1988.

## SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Equal Protection Clause (Fourteenth Amendment)
### (Against All Defendants)

401.     Plaintiff incorporates by reference all preceding paragraphs.

402.     Defendant Michael C. Peoples, as City Manager of Gastonia, North Carolina, held final policymaking authority over the administration, supervision, and discipline of city departments, including the Gastonia Police Department, pursuant to N.C. Gen. Stat. § 160A-148 and the City's municipal governance structure.

403.     From 2017 to the present, Mr. Peoples received and reviewed data from the Gastonia Police Department documenting the outcomes of use-of-force complaints, including those alleging excessive and deadly force. These records showed that between 2013 and 2022, not a single complaint filed by a Black civilian was sustained, even in cases involving serious injury or death, including the shooting of Jason Lipscomb. In contrast, White complainants occasionally received favorable outcomes in lesser incidents.

404.     Despite clear evidence of persistent racial disparities in use-of-force findings and complaint outcomes, Mr. Peoples failed to implement policy reforms, conduct meaningful oversight, or address the discriminatory impact of GPD's internal affairs process. His failure to act constitutes deliberate indifference to the rights of Black citizens, including Mr. Lipscomb, and supports an inference of discriminatory purpose under the Equal Protection Clause.

405.     Mr. Peoples' inaction, taken with full knowledge of racially disparate outcomes, reflects a municipal policy or custom of unequal treatment based on race, which proximately caused the constitutional deprivation suffered by Mr. Lipscomb and his Estate.

406.     The actions and omissions of the City Manager, acting as the City's final policymaker, constitute a violation of the Fourteenth Amendment's guarantee of equal protection under 42 U.S.C. § 1983.

407.     The Fourteenth Amendment to the United States Constitution guarantees all person's equal protection of the laws. Defendants' conduct, including the unconstitutional use of deadly force against Mr. Lipscomb, was motivated in part by race or occurred pursuant to racially discriminatory customs and practices maintained and ratified by the City of Gastonia.

408.     Mr. Lipscomb, a young Black man, was treated differently than similarly situated individuals who are not Black.

409.     In particular, he was subjected to deadly force without a warrant, without evidence of a weapon, and while attempting to flee, in circumstances where a non-Black individual would not likely have been met with such escalation.

410.     The Gastonia Police Department (1) applied deadly force more frequently to Black civilians, (2) was less likely to sustain complaints brought by Black complainants, and (3) failed to enact any remedial policy—despite documented disparities supporting a finding of both discriminatory effect and intent.

411.    In 2021, the only use-of-force complaint deemed 'Not Justified' involved a white civilian. By contrast, every complaint involving Black civilians that year was ruled 'Justified.' These similarly situated comparisons underscore a discriminatory pattern actionable.

412.    The City of Gastonia has a pattern and practice of disproportionately subjecting Black individuals to traffic stops, field interviews, and vehicle searches.

413.    Defendant's Internal records show that all officer-involved shootings of Black civilians were deemed "justified," and complaints of misconduct filed by Black individuals were uniformly exonerated or unfounded—regardless of supporting evidence.

414.    Defendants' own complaint resolution history shows that Black civilians were categorically denied relief—even where the force used resulted in hospitalization or death—while complaints by white civilians involving mere verbal altercations or rudeness were occasionally sustained. These disparities are not statistically random; they reflect a municipal tolerance of racialized enforcement that offends equal protection.

415.    The Fourteenth Amendment to the United States Constitution guarantees all person's equal protection of the laws. Defendants' conduct, including the unconstitutional use of deadly force against Mr. Lipscomb, was motivated in part by race or occurred pursuant to racially discriminatory customs and practices

maintained and ratified by the City of Gastonia.

416.     Mr. Lipscomb, a young Black man, was treated differently than similarly situated individuals who are not Black.

417.     In particular, he was subjected to deadly force without a warrant, without evidence of a weapon, and while attempting to flee, in circumstances where a non-Black individual would not likely have been met with such escalation.

418.     From 2013 through 2022, the City of Gastonia's own records reflect that every officer-involved shooting involving a Black civilian was ruled "Justified," even in cases where the subject was unarmed and fleeing. Not a single such case was found "Not Justified" or resulted in discipline. Conversely, in at least two incidents involving White civilians—specifically Case No. 2013-0234 and Case No. 2019-0190—the City ruled the officer's use of deadly force as "Not Justified." These incidents, where White civilians were reportedly fleeing or posed minimal threat, demonstrate a stark disparity in how force outcomes were determined based on race.

419.     Complaint outcome data from 2013 to 2022 shows that not one excessive or deadly force complaint filed by a Black civilian was sustained. Black complainants alleging serious injuries, including from firearm discharge or deadly force, were consistently dismissed with findings of "Justified," "Unfounded," or "Not Sustained." In contrast, White complainants, even in less serious incidents involving rudeness or minor policy violations, occasionally received sustained outcomes.

420.     In 2021 alone, every single use-of-force complaint filed by Black civilians was ruled "Justified." The only "Not Justified" ruling that year arose from a complaint filed by a White civilian. This disparate treatment exists despite African Americans comprising just 28.9% of the city's population, while consistently making up nearly half of all traffic stops and use-of-force targets.

421.     Out of 192 civilian complaints of police misconduct from 2016 to 2021, only 14% were ruled in favor of civilians. Notably, none of the 14 reported complaints of police discrimination were upheld.

422.     The City of Gastonia has taken no remedial action despite being aware of this data. No bias-based complaint has been sustained, and no systemic reforms have been adopted. This consistent refusal to act, despite clear disparities in enforcement and complaint outcomes, demonstrates deliberate indifference and supports an inference of discriminatory intent.

423.     The City's consistent failure to sustain any bias-related complaint, coupled with the exoneration of every officer in every shooting of a Black civilian across a decade, reflects a pattern of municipal conduct that violates the Equal Protection Clause.

424.     Defendants' actions were not only unreasonable under the Fourth Amendment but also reflected a denial of equal protection under the law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

425.     The City Manager had final policymaking authority over discipline,

complaint review, or enforcement policy, and they knew or should have known that Black civilians' complaints were uniformly dismissed, but failed to act.

426. The City Manager failed to intervene or correct a known pattern of racially discriminatory use-of-force outcomes, despite receiving internal reports or annual data showing racial disparities.

427. The City Manager oversaw the Internal Affairs process, and allowed discriminatory complaint outcomes based on race (e.g., zero sustained deadly-force complaints from Black civilians over a decade), and took no corrective steps, despite having the power to do so.

428. The City Manager approved every deadly force case against Black civilians as "Justified" while disciplining officers based on white complainants' lesser complaints.

429. As a direct and proximate result of this racially discriminatory treatment, Plaintiff suffered the death of her son, along with associated damages, for which she now seeks relief.

430. The City Manager's consistent failure to sustain any bias-based complaint despite annual reports documenting significant racial disparities in enforcement decisions supports an inference of discriminatory intent or, at minimum, reckless disregard for constitutional rights.

431. From 2013 to 2022, not a single deadly force complaint filed by a

Black civilian in Gastonia was sustained, despite the severity of force involved. By contrast, white complainants received sustained findings in lesser cases, including rudeness and K-9 misconduct. The City of Gastonia, its Police Chief, and City Manager reviewed this data annually yet never imposed discipline, modified policy, or acknowledged fault. This pattern of racially disparate outcomes, coupled with deliberate inaction by final policymakers, evidences intentional discrimination in violation of the Equal Protection Clause.

432.     Defendants' actions were not only unreasonable under the Fourth Amendment but also reflected a denial of equal protection under the law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

433.     As a direct and proximate result of this racially discriminatory treatment, Plaintiff suffered the death of her son, along with associated damages, for which she now seeks relief.

**SEVENTH CLAIM FOR RELIEF**

(Punitive Damages)

434.     The preceding and foregoing paragraphs are incorporated by reference as if fully set forth herein.

435.     As a direct and proximate result of the grossly negligent, reckless, intentional and willful conduct of Defendants Sepulveda, Beaver, and Hamorsky, yas well as their conscious disregard of the health and safety of Lipscomb, and other members of the law abiding public as alleged herein Plaintiff is entitled to recover

punitive and exemplary damages under both federal and state law to punish Defendants for their illegal, egregiously wrongful, reckless, willful, and/or wanton misconduct and to determine such conduct by others.

436. Plaintiff is entitled to recover punitive damages from Defendants, jointly and severally, in an amount later to be determined at trial.

<u>PRAYER FOR RELIEF</u>

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A. Plaintiff seeks compensatory, consequential, and punitive damages in an amount to be determined at trial, including amounts that exceed all available insurance coverage, to fully redress the constitutional violations, wrongful death, and conscious-shocking use of force described herein.

B. That Plaintiff have and recover of Defendants, jointly and severally, an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for the damages caused to Plaintiff;

C. That Plaintiff have and recover of Defendants, jointly and severally, an amount later to be determined at trial and exceeding the jurisdictional limit of this Court for punitive and exemplary damages;

D. That all issues of fact be tried by a jury;

E. That Plaintiff recover from Defendants, jointly and severally, the costs of this action and reasonable attorney's fees to the fullest extent allowed by the laws of North Carolina and the United States;

F. That Plaintiff recover pre- and post-judgment interest at the lawful rate; and,

G. any further relief that this court deems just and proper, and any other appropriate relief a law and equity.

PLAINTIFF REQUESTS A TRIAL BY JURY.

Respectfully submitted this Saturday, July 19, 2025.

Respectfully submitted,

_/s/ Micheal L. Littlejohn Jr._
Micheal L. Littlejohn, Jr.
N.C. Bar No. 49353
Littlejohn Law PLLC
PO Box 16661
Charlotte, NC 28297
Telephone: (704) 322-4581
Fax: (704) 625-9396
Email: mll@littlejohn-law.com
**Counsel for Plaintiff**