**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:25-CV-00527-KDB-DCK**

| | |
|---|---|
| **THELMA MACKINS,** | |
| **Plaintiff,** | |
| **v.** | **MEMORANDUM AND ORDER** |
| **JUAN PABLO SEPULVEDA, ET AL.,** | |
| **Defendants.** | |

In the afternoon of July 20, 2022, police sought to question Jason Lipscomb in connection with a report of the kidnapping of two children from a local daycare. What later was revealed to be a domestic dispute between parents then tragically escalated. To avoid speaking with the officers, Lipscomb sprinted away, jumped into a vehicle and ran over one of the officers as he backed out of the parking space to drive away. He was shot and killed when he drove forward towards another officer and turned to go down the street. In July 2025, Lipscomb's mother Thelma Mackins filed this action against the individual police officers involved in the shooting and the City of Gastonia alleging that police misconduct led to his death. Now before the Court is Defendants' Motion for Judgment on the Pleadings (Doc. No. 12).

The Court has carefully considered this motion, the parties' briefs and exhibits and oral argument on the motion from the parties' counsel on January 8, 2025. For the reasons discussed below, the Court finds that under the circumstances pled in the Complaint, both together with and independent of the Court's review of the relevant body-worn camera videos of the incident, the officers' use of force was objectively reasonable and, in any event, is protected by the officers'

1

qualified immunity to engage in conduct which does not violate clearly established constitutional rights. Specifically, it was reasonable for the officers to use deadly force against Lipscomb to protect their fellow officer who had been run over and any other officer or person in harm's way as Lipscomb attempted to flee. And, doing so has not been established to be a constitutional violation by any authority (indeed, it is constitutionally permitted). Therefore, Defendants' motion will be **GRANTED**.

## I.      LEGAL STANDARD

Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Rule 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In resolving a motion for judgment on the pleadings, the court must accept all of the non-movant's factual averments as true and draw all reasonable inferences in its favor. *Bradley v. Ramsey*, 329 F. Supp. 2d 617, 622 (W.D.N.C. 2004). Judgment on the pleadings is warranted where the undisputed facts demonstrate that the moving party is entitled to judgement as a matter of law. *Id.*

The court may consider the complaint, answer, motions and any materials attached to those pleadings "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176 (4th Cir. 2009); *see also* Fed. R. Civ. P. 10(c) (stating that "an exhibit to a pleading is part of the pleading for all purposes."). Similarly, the Court can consider a police officer's body-worn camera video in ruling on a motion for judgment on the pleadings "when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video "clearly depicts a set of facts contrary to those alleged in the complaint," or "blatantly contradicts" the plaintiff's allegations, rendering the plaintiff's allegations implausible." *Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024).

Except for consideration of the answer, *see Alexander v. City of Greensboro*, 801 F. Supp 2d. 429, 433 (M.D.N.C. 2011), a motion for judgment on the pleadings is generally governed by the standard applicable to a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Butler v. United States*, 702 F.3d 749, 751–52 (4th Cir. 2012); *Shipp v. Goldade*, No. 5:19-CV-00085-KDB-DCK, 2020 WL 1429248, at *1 (W.D.N.C. Mar. 19, 2020). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973, 167 L. Ed. 2d 929 (2007); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Construing the facts in this manner, a complaint must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II.    FACTS AND PROCEDURAL HISTORY

Jason Lipscomb and Trinity Adams were the parents of one child who attended the same daycare as two of Trinity's brothers.  Doc. No. 1 ("Complaint"), ¶¶ 36-37. On July 20, 2022, Lipscomb picked up his child and Trinity Adams' brothers from daycare.  *Id*. ¶¶ 37-39. The Complaint alleges that the daycare facility was familiar with Lipscomb and he routinely picked up his child and Trinity's brothers together; nevertheless, Trinity and her mother, Tina Adams, reported to law enforcement an alleged kidnapping of Trinity's brothers by Lipscomb. *Id*. ¶¶ 36-39, 42.    Police dispatch broadcasted the information over the radio, notifying officers that Lipscomb "was the suspect in a child abduction call." *Id*. ¶ 60. No arrest warrant was issued. *Id*. ¶¶ 42-45.

 After the alleged kidnapping was reported, uniformed police officers with the City of Gastonia Police Department, including Harrison Hamorsky, Jason Beaver, and Ethan Brown, along with plainclothes officer Juan Sepulveda, went to Lipscomb's mother's residence to investigate. The officers knocked on the door and said they were looking for Lipscomb and the three children. *Id*. ¶ 42. The officers "returned the children to Tina," and the allegedly abducted children were seen safely with their mother before the encounter escalated. *Id*. ¶¶ 46, 51, 54.

The "escalation" began suddenly and ended in less than 30 seconds, with the most critical part taking only a few seconds. *See* Body Worn Camera Video of Officer Hamorsky ("Hamorsky BWC"). As officers were at the door speaking to Lipscomb's father, Robert Hamlett, "Lipscomb was seen walking from the rear of [the] residence" by Tina Adams. Complaint, ¶¶ 49, 61-62.  She alerted the officers to Lipscomb, who began to run away "towards a silver Hyundai parked nearby in a parking spot." *Id*. ¶¶ 61-63. "Officer Ethan Brown led the foot chase" and Detective Sepulveda

and Officers Beaver and Hamorsky also ran after Lipscomb. *Id*. ¶¶ 63, 65. Lipscomb did not brandish a weapon, make threats, or commit any act of violence prior to entering the car. *Id*. ¶ 67.

Lipscomb reached the car first and got into the driver's seat. *Id*. ¶¶ 66, 70. The officers followed and went to different parts of the car. Officer Brown approached the door with his gun drawn and "pointed directly" at Lipscomb, repeatedly yelling at Lipscomb to "get out of the car" and "stop the car." *Id*. ¶¶ 70, 140; Body Worn Camera Video of Officer Brown ("Brown BWC") at 12:52:25-27. Also, prior to the car moving, Brown "opened the driver side door," *Id*. ¶ 71; Brown BWC at 12:52:27. Sepulveda was positioned "to the right of the front bumper, with his firearm pointed at Mr. Lipscomb." Complaint, ¶ 74. Hamorsky was on the passenger side and Beaver was at the rear of the vehicle. *Id*. ¶¶ 66, 173; Hamorsky BWC at 12:52:27-28.[1]

Lipscomb did not comply with the officers' request to leave or turn off the vehicle; instead, he sharply moved the car in reverse. Brown BWC at 12:52:28-29; Hamorsky BWC at 12:52:26-28. As expressly acknowledged in the Complaint (and dramatically confirmed in Brown's BWC video), "[a]s Mr. Lipscomb's vehicle was in reverse, the open driver's side door knocked Officer Brown to the ground." Complaint, ¶¶ 80-81; Brown BWC at 12:52:28-32. The Complaint states that the other officers were aware that Brown had been hit and knocked down, and indeed emphasizes that they could not see exactly where he was on the ground or under the car as the car reversed and then started moving forward. Complaint, ¶¶ 84-86, 88 ("All three officers acknowledged that Mr Lipscomb's Hyundai reversed, struck Brown with the door frame, and then proceeded forward and away.").

---

[1] The Brown and Hamorsky BWC videos are not exactly synched as to time, with an approximately two second difference between them. Therefore, the Court's time citation to each BWC video is related only to the video referenced.

5

It was a chaotic scene. In addition to the officers, a young man had run to the vehicle and even had his hands on it as it reversed. Hamorsky BWC at 12:52:27. Brown was crying out as he was being hit by the door and dragged under the vehicle. A siren can be heard. Hamorsky BWC at 12:52:27-29. When Lipscomb began moving the car forward towards Detective Sepulveda, he and other officers began shooting. Hamorsky BWC at 12:52:29-30. Sepulveda believed Brown had been "run over" and fired "2 rounds [through] the windshield" at Lipscomb when the car was only "one-to-two feet" away. *Id.*; Complaint, ¶¶ 97, 211. He later moved to the passenger side of the car and fired nine more rounds as the car drove away from him. *Id.* ¶ 111.



From his position "towards the back" of the Hyundai, Beaver began shooting "directly into where Lipscomb was sitting" in the driver's seat when Sepulveda fired. *Id.* ¶¶ 121-122.  He continued firing without regard to the movement of Lipscomb's vehicle,[2]  reloaded his weapon, and continued to fire (21 rounds total) as he saw the taillights of Lipscomb's car. *Id.* ¶¶ 121-124.

---

[2] The Complaint at points alleges that the officers began shooting as Lipscomb reversed; however, the Hamorsky BWC makes clear that the first shots were fired as the car moved forward. Hamorsky BWC at 12:52:29-30. Also, the Complaint notes that the Medical Examiner determined that the fatal shot "originated from the front while the vehicle was advancing away (not reversing)." Complaint, ¶ 112.

6

Hamorsky fired 3 rounds into Lipscomb's car as it was moving away at roughly eight yards. He stated to the SBI that from when he fired his first shot to the time he fired his third shot, Lipscomb's car was fifteen yards away. *Id*. ¶¶ 126-127. The Complaint alleges that Officer Brown "had already fallen away from the vehicle and rolled across the road when Hamorsky fired." *Id*. ¶ 346; *see* Hamorsky BWC at 12:52:32 (as the car straightens out and proceeds down the street, Officer Brown is seen being ejected from the car's undercarriage). The officers continued shooting as Lipscomb drove away. Not far down the street, Lipscomb's car veered to the right and stopped when it hit a parked car. *Id*. ¶ 160; Hamorsky BWC at 12:52:32-40. The officers rushed down the street, and Lipscomb was pronounced dead at the scene of the crash. *Id*. ¶¶ 99, 346.

The Complaint alleges that, according to the Medical Examiner, one of the two shots fired by Sepulveda was the "fatal projectile" within "the initial shots fired from the vehicle's front-right quarter," which entered Lipscomb's chest and exited through his back. *Id*. ¶¶ 108-112, 159. It further alleges that the Estate of Jason B. Lipscomb commissioned an independent autopsy following his death. That autopsy concluded that "one of the fatal rounds entered Jason Lipscomb's front chest and travelled front-to-back," consistent with the findings of the Medical Examiner. Others were to Mr. Lipscomb's head, rear, and side. *Id*. ¶¶ 153-154. Finally, with respect to the fatal shot(s), the Complaint alleges Lipscomb was "struck by seven bullets, only one of which was fatal." *Id*. ¶ 236.

Plaintiff filed her Complaint on July 19, 2025. It asserts numerous causes of action: Section 1983 claims against Sepulveda, Beaver and Hamorsky in their individual capacities; a North Carolina state law claim for assault and battery against Officer Beaver in his individual and official capacities; a Section 1983 *Monell* claim against the City of Gastonia; an equal protection claim against all Defendants and a claim for punitive damages. Defendants answered the Complaint and

7

later filed their Motion for Judgment on the Pleadings asking the Court to enter judgment in their favor on all of Plaintiff's claims. The motion is fully briefed and the Court held oral argument on the motion on January 8, 2026. It is ripe for the Court's ruling.

### III.    DISCUSSION

While Plaintiff asserts numerous causes of action, the core question before the Court is whether Defendants' conduct could plausibly be found to be a constitutional violation; more specifically, whether Defendants used "excessive force" against Lipscomb. And, if a constitutional violation could be found under the particular circumstances of this case,[3] then the Court must determine if that violation was sufficiently established that Defendants lose their "qualified immunity" from liability and litigation over their actions. Those issues are each addressed below, after a brief discussion of the Court's use of the body-worn camera videos.

### A.    Consideration of Body-Worn Camera Video

As detailed below, the Court would find the absence of an "excessive force" constitutional violation and that the individual defendants are entitled to qualified immunity based only on the Complaint; however, the Court may also consider the body-worn camera videos of Officers Brown and Hamorsky in accordance with the governing standards described above. First, as admitted by Plaintiff's counsel at oral argument, the videos depict the events and conduct which Plaintiff contends is unconstitutional and are therefore "integral" to Plaintiff's claims. Second, there is no dispute that the videos are authentic.

---

[3] Encounters between citizens and law enforcement are, unfortunately, too often in the news. The Court emphasizes that each situation must be carefully and thoughtfully evaluated on its own merits in accordance with the specific relevant facts. As explained below, law enforcement does not have an open license to exercise deadly force, but may do so (without the unfair application of hindsight) when it is "objectively reasonable" under the totality of the circumstances.

Finally, as discussed above, the videos "clearly depict[] a set of facts contrary to those alleged in the complaint," and "blatantly contradict[]" the plaintiff's allegations in several respects, including, *inter alia*, that 1) Lipscomb did not reverse the car "slowly" out of the parking space, 2) Brown opened the car door prior to the car moving in reverse, 3) there was an "ongoing threat" as Lipscomb reversed out of the parking space hitting Brown with the open door and then drove forward towards Sepulveda and 4) the fatal shot(s) were fired as Lipscomb was driving towards Sepulveda (pictured above). Therefore, the videos here satisfy the relevant test, and the Court may (and indeed should) consider the body-worn camera videos in its search for the truth. *See Doriety*, 109 F.4th at 679–80.

## B.    Claim of Constitutionally Excessive Force

Plaintiff's primary claims under federal law are her claims that the individual defendants and the City of Gastonia violated 42 U.S.C. § 1983. While not a source of substantive rights, Section 1983 provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, a case filed under 42 USC § 1983 provides potential remedial relief for a plaintiff who can prove that a person acting under color of state law deprived him of a right secured by federal law, including violations of federal constitutional rights, as well as certain limited federal statutory rights. *See Maine v. Thiboutot*, 448 U.S. 1 (1980); *Knibbs v. Momphard*, 30 F.4th 200,

214 (4th Cir. 2022*); Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017).
Here, Plaintiff alleges that the law enforcement officers "used excessive force ... in violation of
the Fourth Amendment's right to be free from unreasonable seizures." Complaint, ¶ 5;[4] *see
Barnes v. Felix*, 605 U.S. 73, 76 (2025) ("A claim that a law enforcement officer used excessive
force during a stop or arrest is 'analyzed under the Fourth Amendment.'").

A police officer's use of deadly force violates the Fourth Amendment when it is not
"objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). And that inquiry into
reasonableness requires assessing the "totality of the circumstances." *Barnes*, 605 U.S. at 76
(quoting *Graham* at 396, which quoted *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Thus, to assess
whether an officer acted reasonably in using force, a court must consider all the relevant
circumstances, including facts and events leading up to the climactic moment. *Id*. Although the
situation at the precise time of the shooting will often be what matters most, earlier facts and
circumstances[5] may bear on how a reasonable officer would have understood and responded to
later ones. *Id*. at 79-81 (citing with approval *Plumhoff v. Rickard*, 572 U.S. 765 (2014)) (no
constitutional violation found when a driver was shot after a high-speed chase had come to "a near
standstill," but the driver was still trying to get away and might "again pose a deadly threat for
others").

_____

[4] The Complaint also asserts a claim under the Fourteenth Amendment. *See* Complaint, ¶¶ 401-
433, which challenges the City of Gastonia's alleged historical response to claims of excessive
force against black citizens. This secondary claim, which does not allege any other incident
involving these officers (or the specifics of any other excessive force claim) is addressed below.
[5] In *Barnes*, the Supreme Court cited several examples: the "severity of the crime" prompting the
stop can carry weight in the analysis; the actions the officer took during the stop, such as giving
warnings or otherwise trying to control the encounter; and "the stopped person's conduct is always
relevant because it indicates the nature and level of the threat he poses, either to the officer or to
others." 605 U.S. at 80.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). To assess whether the force used was reasonable, the Court applies the factors outlined by the Supreme Court in *Graham:* (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. That inquiry involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. (quoting *Garner*, 471 U.S. at 8). Further, the cases caution judges to remember that it is one thing to dissect and scrutinize an officer's actions with the "20/20 vision of hindsight," "in the peace of a judge's chambers," and quite another to make "split-second judgments" on the ground, "in circumstances that are tense, uncertain, and rapidly evolving." *Id*. at 396-97; *see Barnes*, 605 U.S. at 89-90. (Kavanaugh, J. concurring); *Est. of Parker v. Mississippi Dep't of Pub. Safety*, 140 F.4th 226, 239, 242 (5th Cir. 2025) (declining to "second guess" decision officers were forced to make "in the split second after Smith fired on one of their own" —"in haste, under pressure, and ... without the luxury of a second chance.").

Considering the "totality of the circumstances," the "severity of the crime" in a sense points in both directions. A charge that a child has been kidnapped (even, or perhaps especially, in the context of a dispute between parents) is a serious crime warranting immediate attention. However, here the allegedly abducted children had been safely reunited with their mother prior to the shooting. Therefore, the "severity of the crime" informs, but does not strongly support either the presence or absence of "objective reasonableness."

The second *Graham* factor, "whether the suspect poses an immediate threat to the safety of the officers or others," is often the most important when considering the use of deadly force.

11

*See Caraway v. City of Pineville*, 111 F.4th 369, 382 (4th Cir. 2024); *Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023) ("In excessive force cases where an officer uses deadly force, the second *Graham* factor is particularly important."). While Plaintiff summarily alleges that Lipscomb did not pose an immediate threat to the officers and others, the facts she alleges demonstrate otherwise. *See Craven v. Novelli*, 661 F. Supp. 3d 430, 442-446 (W.D.N.C. 2023), *aff'd*, No. 23-1393, 2024 WL 1952590 (4th Cir. May 3, 2024) ("Plaintiff is of course entitled to argue her own version of what happened, but she must create that "version" from actual facts, not speculation, assertions or inferences at odds with undisputed video or physical evidence.").

First, Lipscomb failed to heed the officers' repeated demands to stop, get out of the car and stop the car's engine. "Once the officer issued a verbal command, the character of the situation transformed." *See Knibbs,* 30 F.4th at 220 (quoting *Hensley,* 876 F.3d at 585). If a suspect continues to move and fails to show the officer his or her hands after being commanded to do so, "the suspect's *continued movement* will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions." *Id.* (quoting *Hensley*, 876 F.3d at 585) (emphasis supplied in *Knibbs*); *see Craven v. Novelli*, 661 F. Supp. 3d 430, 442-446 (W.D.N.C. 2023), *aff'd,* No. 23-1393, 2024 WL 1952590 (4th Cir. May 3, 2024).

Second, and most obvious, Lipscomb's decision to abruptly back the car out of its parking space, running over Officer Brown in the process, put Brown in immediate danger. Again, Plaintiff emphasizes that the other officers did not know exactly where Brown was relative to the car. Yet, there is no dispute that at one moment the officers saw Brown at the car's open driver's side door then in the next moments – after the car reversed – Brown could not be seen. Plainly, as Plaintiff acknowledges in the Complaint, Brown had been run over and Lipscomb was still moving the car. Thus, there was an "immediate threat" to Brown's safety to which the other officers were entitled

12

to respond. Further, in the few seconds the car moved both back towards Officer Beaver and then forward towards Sepulveda, the safety of those officers (in particular Sepulveda) were threatened. These threats are, of course, even more vividly shown on the BWC videos, which makes clear how Lipscomb's car was coming towards Sepulveda and how little time he had to respond.[6] The second Graham factor therefore strongly supports the finding that the Officers' use of deadly force was objectively reasonable as a matter of law.

Finally, the third factor – Lipscomb's attempt to evade the officers – supports the Officers' position. As Justice Kavanaugh recently explained at length in his concurrence in *Barnes*, when "the driver suddenly pulls away in the midst of a stop, the risks multiply." 605 U.S. at 84-90. "[T]he very 'fact that a suspect flees when suspected of a minor offense,' such as speeding or a failure to pay tolls, 'could well be indicative of a larger danger.'" *Id*. (quoting *Lange v. California*, 594 U.S. 295, 331 (2021) (Roberts, C.J., concurring in judgment)). "Fleeing from the stop could suggest that the driver is preparing to commit or has committed a more serious crime—and is attempting to evade detection or arrest." *Id*. Or – in language that is particularly relevant here – "as the tragic 2025 New Year's terrorist attack in New Orleans illustrates, the driver might intend to use the car as a weapon. *Id*. at 86. As the concurrence concludes, "the possibilities are many. But the key point is a commonsense one: A driver who speeds away from a traffic stop can pose significant dangers to both the officer and the surrounding community." *Id*. at 87.[7]

---

[6] Although Lipscomb ultimately turned the wheel and did not hit Sepulveda, the relevant factor is whether there was an immediate *threat* to his safety. Sepulveda was clearly in immediate danger as the car moved quickly towards him (from only a few feet away), particularly in the context of a driver who had already run over one of Sepulveda's fellow officers.

[7] The *Barnes* concurrence further explains how the few options available to law enforcement when a suspect flees in a car are neither good nor safe. First, the officer could simply let the driver go. But letting the driver go may exacerbate the dangers, rather than mitigate them. Encouraging officers to stand back and allow drivers to take off would also create "perverse incentives" for

13

Indeed, the Supreme Court has expressly authorized the use of deadly force to "prevent [the] escape" of someone who reasonably appears to have "committed a crime involving the infliction or threatened infliction of serious physical harm . . . ." *Garner*, 471 U.S. at 11. Intentionally hitting a police officer with a car door and knocking him down under the car clearly is a crime involving the "infliction or threatened infliction of serious physical harm."

Further, the Supreme Court has approved of officers continuing to fire at a fleeing vehicle no longer directly threatening officers if a dangerous suspect "never abandoned his attempt to flee." *Plumhoff*, 572 U.S. at 777. In *Plumhoff*, the Court considered the fatal shooting of a motorist who had led police on a dangerous vehicle pursuit, which came to a "near standstill," but then the driver resumed fleeing. Even though no police officer was struck by the vehicle, the Supreme Court upheld a second volley of twelve shots into the vehicle after it passed officers and "continued 'fleeing down [the]' street." *Id*. at 770. "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id*. at 777. The case would be different, the Court noted, "if [the officers] had initiated a second round of shots after the initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up." *Id*. The same rule applies here. Even though Lipscomb managed (only for a short time) to move past the Defendants, the safety threat to the community had not ended because, like in *Plumhoff*, Lipscomb "never abandoned his attempt to flee." *Id*.

---

those who are stopped by the police. 605 U.S. at 87. Second, the officer could get in a police car and give chase, or could radio other officers to pursue the driver. (Indeed, here, the BWC video shows a police vehicle beginning to drive down the street after Lipscomb). But a high-speed chase likewise can be exceptionally dangerous to the officer, the driver, and others on the road. *Id*. at 88. Further, a study cited in the concurrence concluded that a significant percentage of those killed in police chases are not the fleeing drivers but rather are passengers or bystanders. From 2017 through 2022, more than 500 bystanders were reportedly killed as a result of police chases. *Id*.

14

Plaintiff appears to contend that the Defendants should have further attempted to "deescalate" the situation and held their fire, thereby allowing Lipscomb to run over Officer Brown then continue down the street and away from the scene.[8]  But that choice not only would have negated the other officers' opportunity to protect Brown (and themselves), it also ignores the considerable risks inherent in allowing a person who was willing to hit a police officer with a car drive out into the community, likely only trading the immediate encounter for a potentially more deadly chase with a police car. *See Barnes*, 605 U.S. at 88. Moreover, if doing nothing in response to a fleeing driver became a known and regular practice among police officers, that would presumably embolden more drivers to flee, multiplying risks to officers, drivers and the community. *Id.* at 87.

Quite understandably, Plaintiff wishfully envisions an alternative scenario in which the officers entered the volatile situation and somehow persuaded Lipscomb to talk with them rather than run. Even if that had been possible, and Lipscomb's immediate flight gave the Defendants no time to convince him otherwise, it is not the Court's role to determine if that sad day could have ended differently. Neither "best practices" nor perfect outcomes are constitutionally mandated.

_____

[8] This case is fundamentally different than *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005), *Williams v. Strickland*, 917 F.3d 763 (4th Cir. 2019) and other cases cited by Plaintiff which hold that police cannot shoot a fleeing driver after a threat has passed and they are no longer in the trajectory of the suspect's vehicle. First, *Waterman* itself has been described as holding that "law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them." *See Williams*, 917 F.3d at 770. Those facts apply here. Further, even if that were not the case, none of the Plaintiff's cited cases involve shooting at a driver who had backed over and was in the process of dragging an officer either on the ground or under the car. Those undisputed facts create the immediate and ongoing threat to safety (and serious physical injury) which justified the use of deadly force in *Garner* and *Plumhoff* and make *Waterman* and its progeny inapplicable.

15

*Craven*, 661 F. Supp. 3d at 447. Yes, the Officers' response to the kidnapping call could have turned out much better, but it also could have turned out far worse, with an extended car chase or later encounter in which more people died. *Id*. It is a considerable understatement to say it is regrettable when police efforts intended to protect the community (here, young children who had allegedly been kidnapped) lead to tragic consequences. However, the Court must address the circumstances as they occurred and make a judgment only on the limited legal questions presented.

In sum, considering the totality of the circumstances in this case, the Court concludes that a reasonable officer faced with similar circumstances would determine that Lipscomb "pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396; *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (the Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others."). Again, in situations like these, the law makes "allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. As a matter of law, the judgment of the Defendants to use deadly force – faced with a suspect who had ignored their pleas that he end his flight and then ran over one of their fellow officers as he continued to flee – was objectively reasonable, not excessive, and did not violate Lipscomb's Fourth Amendment rights. Having failed to establish a plausible violation of Lipscomb's constitutional rights, Plaintiff's claims under Section 1983 based on the Fourth Amendment cannot proceed.[9]

_____

[9] The absence of a viable constitutional claim for "excessive force" also dooms Plaintiff's *Monell* claim as well as her claim based on the Equal Protection Clause of the Fourteenth Amendment (alleging that the officers treated Lipscomb differently than a white citizen). At the core of all these claims is the allegation that the Defendants acted wrongfully in shooting Lipscomb. Because the

### C.     Qualified Immunity

Even if the individual Defendants used constitutionally "excessive force" and violated Lipscomb's constitutional rights (which they did not), the Court finds that they have qualified immunity as to Plaintiff's Section 1983 claims. When, as here, a law enforcement officer is sued in his individual capacity, he is "entitled to invoke qualified immunity, which is ... immunity from suit itself." *Cooper*, 735 F.3d at 158. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Knibbs,* 30 F.4th at 214 (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)). "Qualified immunity is designed to protect[ ] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023) (alterations in original) (internal quotation marks omitted).

The doctrine balances two important values– "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Fourth Circuit has stated:

> The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted).

---

Court finds that Defendants' conduct was not unlawful, but rather constitutionally permissible, Plaintiff's alternative Section 1983 claims must also be dismissed.

In carrying out the qualified immunity analysis, a court's "first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997). The court then engages in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Pearson*, 555 U.S. at 231; *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts have discretion to take these steps in either order. *Id.*

As discussed above, the Court finds that a constitutional violation did not occur, so it need only further address the second alternate question. A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 195 (2001).

It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. *Melgar*, 593 F.3d at 258; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the constitutional premise in question. *Id.* Put differently, a right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question. *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018); *A.G. v. Fattaleh*, No. 520CV00165KDBDCK, 2022 WL 2758607, at *8-9 (W.D.N.C. July 14, 2022).

With respect to Plaintiff's claims of excessive force, she has not offered, nor has the Court found, any authority that would clearly establish that a reasonable officer would have known that

18

he was not permitted to use deadly force under the relevant circumstances. To the contrary, as discussed in detail above, Sepulveda, Beaver and Hamorsky had grounds to use deadly force under the authority of, at least, *Graham*, *Garner* and *Plumhoff*. Therefore, they are entitled to qualified immunity even if the judgment that they did not commit a constitutional violation is incorrect. Plaintiff's counter-argument on qualified immunity mirrors her arguments on the underlying constitutional violation; that is, she argues that it is established that a law enforcement officer cannot shoot a fleeing driver after the trajectory of the escaping vehicle is past the officer. Again, however, *Waterman* and Plaintiff's other cited cases do not involve the very different circumstance present here in which deadly force is used after and while the suspect is running over a fellow officer with his car and then attempting to drive away. Therefore, Plaintiff's cases would not give the individual Defendants' the requisite notice that using deadly force under the actual situation they faced was clearly established to be a constitutional violation. Accordingly, judgment on the pleadings with respect to Plaintiff's federal claims will also be granted to the individual Defendants based on qualified immunity.

### D. Additional Claims

In addition to Plaintiff's Section 1983 claims, Plaintiff has asserted claims under North Carolina state law for assault and battery against Officer Beaver, individually and in his official capacity as well as a general claim for punitive damages against all Defendants. As noted above, the merits of these claims primarily follow and depend on Plaintiff establishing – as was required under her federal claim – that the Officers acted wrongfully and violated Lipscomb's rights, resulting in his death. Thus, the parties focused their arguments on Plaintiff's federal claim, which the Court has done as well in this Order. So, for the same reasons that the Court finds that the Defendants are entitled to judgment on the pleadings on Plaintiff's Federal law claims, they are

also entitled to judgment on Plaintiff's state law claims. Nevertheless, each of Plaintiff's state law claims is addressed briefly below.

(1)     Assault and Battery

The Fourth Circuit has recognized that, "the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence." *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); *Knight Estate of Graham v. City of Fayetteville*, 234 F. Supp. 3d 669, 692 (E.D.N.C. 2017). Therefore, state law tort claims that are premised on an officer's reasonable, non-excessive use of force are not actionable under North Carolina law. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625, 538 S.E.2d 601 (2000); *Todd v. Creech*, 23 N.C. App. 537, 209 S.E.2d 293 (1974); *Bell v. Dawson*, 144 F. Supp. 2d 454, 464 (W.D.N.C. 2001); Wilcoxson v. *Painter*, No. 5:13-CV-732-FL, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) ("[w]here a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims."). Because Plaintiff has failed to establish that Officer Beaver used excessive force or otherwise violated Lipscomb's constitutional rights, he is entitled to judgment on Plaintiff's claim of assault and battery, whether in his individual or official capacity.[10]

---

[10] Having determined that Plaintiff's assault and battery claims fails, the Court need not rule on whether Beaver is entitled to public official immunity under North Carolina law. Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412 (1976) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783 (1952)). North Carolina courts have deemed police officers engaged in performance of their duties as public officials for the purposes of public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726 (2003). However, public official immunity is not absolute. Public officials' actions are not shielded if their actions

(2)     Punitive Damages

Finally, Plaintiff's "claim" for punitive damages cannot survive Defendants' motion.

Although pled as a separate cause of action, Plaintiff's allegations make clear that her claim for

punitive damages is only a request for additional relief on Plaintiff's claims under Section 1983

and North Carolina law. Having already determined that Defendants are entitled to judgment on

Plaintiff's "underlying" claims, Defendants are also entitled to judgment on any claim for

punitive damages related to those claims.

## IV.     ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendants' Motion for Judgment on the Pleadings (Doc. No. 12) is **GRANTED;**
    and

2.  The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: February 2, 2026

Kenneth D. Bell
United States District Judge

---

were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox v.
City of Asheville*, 222 N.C. App. 285, 288, 730 S.E.2d 226 (2012).

21